662 So.2d 552 (1995)
Christopher STEWART
v.
STATE of Mississippi.
No. 92-DP-00921-SCT.
Supreme Court of Mississippi.
September 28, 1995.
*554 W.S. Stuckey, Jr., Stuckey & Stuckey, Greenwood, William C. Trotter, III, Garrard & Trotter, Belzoni, for appellant.
Michael C. Moore, Attorney General, Marvin L. White, Jr., Assistant Attorney General, Charlene R. Pierce, Sp Ass't Attorney General, Jackson, for appellee.
EN BANC.
SULLIVAN, Justice, for the Court:
Christopher Stewart was indicted and charged with having been offered money by, or receiving money from, Ricky Selders for the January 7, 1991 murder of Roderick Ball in violation of Miss. Code Ann. § 97-3-19(2)(d) (1972), and with conspiracy to commit capital murder in violation of Miss. Code Ann. § 97-1-1 (1972). Trial commenced on August 10, 1992 in the Circuit Court of Humphreys County, and the jury convicted Stewart of capital murder and sentenced him to death after finding the following two aggravating circumstances: (1) the capital offense was committed for pecuniary gain, and (2) the capital offense was committed to disrupt or hinder the enforcement of laws. Stewart was also found guilty of conspiracy to commit capital murder and sentenced to twenty *555 years for this charge. The trial court denied Stewart's motion for a new trial, or alternatively, for a j.n.o.v. on August 31, 1992. Because this case must be reversed on the merits, only the following assignments of error warrant discussion:
I. THE TRIAL COURT DEPRIVED CHRISTOPHER STEWART OF HIS RIGHT TO DUE PROCESS OF LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE 3 § 14 OF THE MISSISSIPPI CONSTITUTION OF 1890 BY ARBITRARILY DENYING HIM USE OF A PEREMPTORY CHALLENGE.
II. CHRISTOPHER STEWART CANNOT BE PROSECUTED FOR BOTH § 97-3-19(2)(D) CAPITAL MURDER AND CONSPIRACY TO COMMIT CAPITAL MURDER CONSISTENT WITH THE DOUBLE JEOPARDY CLAUSES OF THE STATE AND FEDERAL CONSTITUTIONS.
III. THE TESTIMONY OF WILBERT ANDERSON WAS INADMISSABLE HEARSAY, WAS NOT RELEVANT, AND WAS ERRONEOUSLY ALLOWED INTO EVIDENCE IN VIOLATION OF THE CONFRONTATION CLAUSE OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
IV. THE TRIAL COURT ERRED IN FAILING TO ALLOW CHRISTOPHER STEWART TO INTRODUCE EVIDENCE AT SENTENCING CONCERNING THE SENTENCE OF HIS CODEFENDANT.
V. THE SENTENCING VERDICT INSTRUCTION WAS DEFECTIVE IN A MANNER WHICH VIOLATES STATE LAW AND THE EIGHTH AMENDMENT.

THE FACTS
Roderick Ball occasionally worked as a paid confidential informant assisting North Central Mississippi Task Force agents apprehend drug dealers. He allegedly purchased cocaine from Ricky Selders in a sting operation which led to Selders' arrest and subsequent indictment on cocaine charges. Ball became an essential witness for the State in the Selder's case which was originally scheduled for trial on July 26, 1990.
Selders visited Darnell Toy at Union National Life Insurance Company and took out $15,000 worth of life insurance on Roderick Ball in October of 1990. It was against company policy to permit anyone to name themselves as a beneficiary when applying for a life insurance policy, however, Selders and Toy were old acquaintances. Toy permitted Selders to forge Ball's signature and designate himself the beneficiary. Toy testified that Selders tried to collect on the policy the same night Ball was killed, but no one ever collected any money or filed a formal claim against the policy. Union National fired Toy for knowingly selling the forged policy.
Wilbert Anderson testified that Selders stopped him in December of 1990 at a gas station in Belzoni and requested that he come by his house. Anderson testified that, the next day at Selders' house, Selders offered him $5000 to kill Roderick Ball to prevent Ball from testifying against Selders in court on the cocaine charges. Anderson said he refused the offer even though Selders increased the offer to $10,000.
Debra Ball ("Debra"), Roderick Ball's widow, testified that Selders, Stewart and her husband were in and out of her house all day long on January 7, 1991. Stewart and Selders often sold drugs to her and her husband since they all smoked crack cocaine. Debra said that around 4:30 p.m., after Selders and Stewart had left her house, she walked to Selders' house to inquire about getting some cocaine. She found Stewart and Selders sitting in Selders' black IROC sports car outside of his house when she arrived. She claimed that Stewart and Selders were insistent on learning the whereabouts of her husband who was at home with the children at the time. Debra said that Selders told her to *556 go the neighbor's house to wait for the cocaine.
Debra Ball heard someone drive the IROC away before Selders entered the neighbor's house about five minutes later. She assumed that Stewart was driving the IROC because Stewart and Selders had been sitting in the car a few minutes earlier. She testified that the car was gone during the time she talked with Selders at the neighbor's house.
At the neighbor's house, Selders gave her the cocaine which she immediately smoked. She testified that she when she went back to Selders' house a second time to get more cocaine, Selders was home but his car was still gone. She left and returned to his house a third time only to find it empty. She testified that the man she saw leaving in the IROC had light skin and was wearing red, and that Christopher Stewart was the only one she knew who fit that description on the day of the murder.
Linda Mack said that she was driving south on Old Highway 49 on January 7, 1991 at about 5:15 or 5:20 p.m. when she saw a black sports car pulled off on the right side of the road facing south. Mack noticed a white object in the open car trunk. Mack said she did not recognize the car until after she had passed it, but recognized it as Selders' car because he was her sister's boyfriend. After she passed by the car, she stopped and backed up to give assistance. She testified that she drove off again after seeing Stewart in her rear view mirror waiving her to go ahead. She never saw Ball, nor heard any gunshots when she stopped.
Brady Roberts noticed the victim lying on the side of the road between 5:10 and 5:30 p.m. on Old Highway 49 on January 7, 1991. Roberts stopped, stepped out of his car and walked to within four feet of the victim. Ball's mouth was twitching, but Ball did not respond to Roberts. Marcy Hale and Charles Rowland also stopped by the side of the road during this time period after seeing the victim. Roy Joshlin testified that he was hunting at approximately 5:00 p.m. on that day approximately one quarter of a mile away from where the victim was found. He said that while hunting, he heard a single gunshot that sounded like a .22 caliber as opposed to a deer rifle. He then heard a car drive away. On his way home, Joshlin stopped where the victim was lying.
Sheriff McMillian was returning from deer hunting when he saw Deputy Coleman stopped by the victim on the side of the road. McMillian stopped and identified the body of Roderick Ball whom he knew from previous undercover narcotics operations. McMillian recovered a live round of ammunition, one spent round at the victim's knees, and another spent round beneath the victim's head. Another live round was later found at the scene.
The autopsy revealed that Ball was shot three times in the right side of the head and once in the back of the head. It concluded that the shots were fired from more than one and one-half feet away. Bullet fragments were recovered in the autopsy, and blood samples were taken. Steven Hayne performed the autopsy and said that the manner of death and the angle of the wounds were consistent with the victim having been shot once in the back of the head while bending over, and three times in the side of the head after falling down.
Charles Scarborough of the Mississippi Highway Patrol examined Selders' IROC under a search warrant. In it was found a white towel and a brown chamois cloth in a bucket in the trunk, a white pillbox containing one .25 caliber automatic cartridge, and some drug paraphernalia in the trunk. Scarborough testified that the rear hatchback window of the IROC was unusually clean when compared to the remaining windows in the car. Laboratory tests revealed type A human blood on the white towel removed from the IROC. Ball, Selders, and Stewart all had type A blood.
Michael Allen with the Mississippi Crime Laboratory identified the casings recovered from the scene as .25 caliber casings of the brand Pans Metallic Corporation ("PMC"). This was the same brand as those found in Selders' vehicle. Allen testified that PMC was an imported brand not nearly as common as the American brands such as Remington, Federal, and Winchester. Allen concluded that the fragments removed in the autopsy were fired from a .25 caliber automatic. Microscopic tests revealed that the two empty cartridge cases found at the scene *557 were fired in the same exact weapon. No murder weapon was ever recovered.
Eddie Smith, a former employee at a rental company, testified that during the first week of January 1991, he went to Stewart's house to check on Stewart's account and observed a silver pistol with a pearl handle which appeared to be .25 caliber. Smith recalled that Stewart quickly picked up the pistol and placed it in his jacket pocket when he noticed that Smith saw the gun.
Jerriel Allen, one of Stewart's fellow inmates at the Humphreys County jail, testified that Stewart confessed in jail, as follows: Stewart drove to Ball's home in the IROC and picked up Ball. They returned to Selders' house where they got in a dark blue four-door Oldsmobile to go smoke cocaine. They drove towards Isola, Mississippi but stopped along the way because Stewart pretended that he needed to urinate. Stewart climbed out of the car and asked Ball to check the car to see if it was leaking gas. Stewart then shot Ball three times in the head, and once in the back after Ball stepped out of the car and bent over to check the car. Stewart claimed that Selders paid him $15,000 for Ball's murder to prevent Ball from testifying against him on a cocaine charge. Stewart hid the money in a house under the floor wrapped in a towel, and tossed the weapon into the river.
Johnny Coppree, a fellow Parchman inmate of Stewart's, also testified that Stewart confessed to killing Ball in a deal with Selders for $15,000 so that Ball could not testify against Selders in court. His recollection of Stewart's story, however, revealed some discrepancies between the two alleged jailhouse confessions.

I. THE TRIAL COURT DEPRIVED CHRISTOPHER STEWART OF HIS RIGHT TO DUE PROCESS OF LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE 3 § 14 OF THE MISSISSIPPI CONSTITUTION OF 1890 BY ARBITRARILY DENYING HIM USE OF A PEREMPTORY CHALLENGE.
The right to peremptory challenges is not mandated by the federal Constitution, but is instead a state created right. Ross v. Oklahoma, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988). A state may place restrictions on the use of peremptory challenges because it is a state created right. Id.; see also Mettetal v. State, 615 So.2d 600, 603 (Miss. 1993) (requiring defendant to use peremptory challenges to cure erroneous denials of challenges for cause). However, the arbitrary denial of a state right rises to a violation of the due process clause of the Fourteenth Amendment. Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S.Ct. 2227, 2229, 65 L.Ed.2d 175 (1980). Mississippi law entitles a capital case defendant to twelve peremptory challenges. Miss. Code Ann. § 99-17-3 (1972); Unif.Crim.R.Cir.Ct.Pr. 5.06. Thus, the arbitrary denial of one of these twelve peremptory challenges afforded in a capital case is a violation of due process. Stewart argues that he was arbitrarily and erroneously denied the use of a peremptory challenge in violation of his due process rights when the trial judge concluded that Stewart failed to offer a neutral non-racial reason for challenging juror Curtis Dean Lloyd.
Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69, 82-83 (1986) held that the prosecution was prohibited from racially discriminating through its exercise of peremptory challenges. In Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Supreme Court held that the Constitution forbid the criminal defendant as well from engaging in intentional racial discrimination in the exercise of peremptory challenges.
The Supreme Court set forth a three step process for determining whether a party has improperly utilized peremptory challenges for the purpose of racially discriminating against potential jurors in violation of the Equal Protection Clause. Batson, 476 U.S. at 96-98, 106 S.Ct. at 1722-24, 90 L.Ed.2d at 87-89. The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge. Id. at *558 96-97, 106 S.Ct. at 1722-23, 90 L.Ed.2d at 87-88. If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror. Id. at 97-98, 106 S.Ct. at 1723-24, 90 L.Ed.2d at 88-89. The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of the peremptory. Id. at 98, 106 S.Ct. at 1723, 90 L.Ed.2d at 88; McCollum, 505 U.S. at 58-59, 112 S.Ct. at 2359; Griffin v. State, 610 So.2d 354, 356 (Miss. 1992).
In the case at hand, the trial judge informed the parties that they would be required from the outset to state race neutral explanations upon each exercise of a peremptory challenge. Stewart asserted his sixth peremptory challenge on juror Curtis Dean Lloyd which resulted in the following exchange:

BY THE COURT: Lloyd is tendered to the defense?

BY MR. TROTTER: D-6 will be Mr. Lloyd for balance; for racial balance on the jury.

BY THE COURT: That is not a non-racial reason.

BY MR. TROTTER: Young; we have some young people on there with more experience also.

MR. CROOK: Your Honor, we object to that as being an attempt at some sort of subterfuge as far as a logical reason of excusing that juror.

BY MRS. BRIDGES: I think the rule is, you would have to excuse everybody in that age group, black or white, if you are going to do it on the basis of age, or it becomes a subterfuge. There is no such thing as a pure peremptory challenge. It's unfortunate.

BY MR. STUCKEY: Did you rule on that, Judge?

BY THE COURT: Uh-huh.

BY MR. STUCKEY: No challenge, correct?

BY THE COURT: So far you haven't given me a race neutral reason for that.

BY MR. TROTTER: That's all, Your Honor.

BY THE COURT: All right, Lloyd will be twelve.
A peremptory challenge does not have to be supported by the same degree of justification required for a challenge for cause. Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88; Harper v. State, 635 So.2d 864, 867 (Miss. 1994); Benson v. State, 551 So.2d 188, 192 (Miss. 1989). The establishment of a race neutral reason is not a difficult task. Furthermore, this Court has supported age as a race-neutral reason in the past. See Harper, 635 So.2d at 868; Simon v. State, 633 So.2d 407, 411 (Miss. 1993); Lockett v. State, 517 So.2d 1346, 1351 (Miss. 1987). Defense counsel ultimately offered age and experience as its reason for exercising this peremptory. It would appear from the face of the record that the defense offered a valid race-neutral reason in its attempt to strike Lloyd from the jury.
On the other hand, this Court affords the trial court great deference in determining whether the offered explanation under the unique circumstances of the case is truly a race neutral reason. Lockett, 517 So.2d at 1349-50. We stated in Lockett:
[A] trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence. This perspective is wholly consistent with our unflagging support of the trial court as the proper forum for resolution of factual controversies.
Id. at 1350. The problem with reviewing the trial court's decision in the case sub judice, even with this deferential standard of review, is that the record is void of any other reference to the exercise of this peremptory. The record even fails to outline the profiles of the jurors who were struck with peremptory challenges. The only part of the record relevant to this issue is found in the short exchange, supra, between the court and the attorneys, and the defense's second explanation involving age and experience was facially valid.
*559 One of the reasons the trial court is granted such deference in a Batson issue is because the demeanor of the attorney making the challenge is often the best evidence on the issue of race neutrality. Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991). The credibility of the one making the challenge is often decisive. Id. In the record before this Court, one can only assume that the demeanor of Stewart's attorney, in combination with his first explanation for the challenge, were decisive factors in the trial judge's ruling since Stewart subsequently offered a facially valid race-neutral reason.
Despite the importance of demeanor evidence, the trial court must consider all the relevant circumstances, such as the way prior peremptory strikes have been used and the nature of the questions posed on voir dire. Griffin v. State, 607 So.2d 1197, 1202 (Miss. 1992). Again, there is nothing in the record which reflects the criteria the trial judge used to conclude that the defense was purposefully discriminating by race in the exercise of its peremptory challenges. The prosecution argues that the deficiency in the record should operate to procedurally bar Stewart from raising this issue on appeal. In Hansen v. State, 592 So.2d 114, 127 (Miss. 1991), this Court ruled against the defendant/appellant on a Batson issue because the record did not suggest the race of any of the jurors challenged. This Court concluded that it was the appellant's burden to ensure that the record contained "sufficient evidence to support his assignments of error on appeal." Id.
The State's argument that Stewart should be procedurally barred from raising this assignment of error on appeal is misplaced. In Hansen, the defendant was the party complaining of racial discrimination. In the present case, it was the prosecution's burden to establish a prima facie case of discrimination. If the Supreme Court holds that Batson prevents a defendant from exercising peremptory challenges in a racially discriminatory manner, then we must also require that the prosecution make the same prima facie showing required of the defendant when he or she complains of discrimination. The defendant must articulate a racially neutral explanation only "if the State demonstrates a prima facie case of racial discrimination by the defendants." McCollum, 505 U.S. at 59, 112 S.Ct. at 2359.
The record clearly demonstrates that the State failed to meet its initial burden. Additionally, when the defense provides a race neutral reason, the prosecution has the ultimate burden to establish a case of racial discrimination. Contrary to the State's argument for a procedural bar, the deficiency in the record only leads us to the conclusion that the State failed to meet its burden to sufficiently rebut the defense's age and experience explanation. See Taylor v. State, 524 So.2d 565, 566 (Miss. 1988) (permitting party to rebut opponent's explanation for exercising peremptory strikes). Stewart is not procedurally barred from raising this assignment of error on appeal. Had the prosecution met its burden of proof, there would have been a record with which to gauge the trial judge's decision.
The absence of the record stems from the fact that the trial judge erroneously required each party to give race neutral reasons upon the exercise of each challenge without requiring the opposing party to make a prima facie case of discrimination or even an objection to the exercise of the peremptory. In Hernandez v. New York, the Court concluded that once a party came forth with its explanation for exercising the peremptory, the sufficiency of the objecting party's prima facie showing of discrimination was moot. Hernandez v. New York, 500 U.S. at 358, 111 S.Ct. at 1866. The prosecution in Hernandez, however, voluntarily defended its peremptory strikes "without any prompting or inquiry from the trial court." Id. In the case at bar, the defense did not voluntarily explain the peremptory in issue. The trial court in fact made the defense prove it was not discriminating without there ever having been an inference of discrimination in the first place.
A trial judge does not have the authority to invoke a Batson hearing on his own initiative. Had the trial court followed the procedure mandated by Batson, there would be a more complete record from which *560 to determine whether this assignment of error has merit. The trial court's failure to follow the correct procedure in the case at bar is the source and creates the basis for the State's entire argument that this assignment of error should be procedurally barred.
In the factually similar case of State v. Foust, 18 Kan. App.2d 617, 857 P.2d 1368, 1373 (1993), the court held that the failure of the trial court to place the initial burden on the State to establish the inference that the defendant was utilizing peremptory challenges to racially discriminate was reversible error. Likewise, we hold that the trial court's failure to place the initial burden on the State to establish a prima facie case of racial discrimination was reversible error. The trial court arbitrarily prompted the Batson inquiry without there ever having been an objection by the prosecution.
While we can not also definitively determine from the record that the defense was not racially discriminating in its selection of jurors, we can conclude from the record that the State failed to meet its overall burden of proof to show that the defense was racially discriminating. The effect is the same. Stewart was arbitrarily and erroneously denied the use of one of his peremptory challenges. The composition of the jury was directly altered as a result. Since our State grants the criminal defendant the right to make twelve peremptory challenges, the arbitrary denial of this right amounted to a violation of the Fourteenth Amendment requiring reversal of the decision below and a new trial.

II. CHRISTOPHER STEWART CANNOT BE PROSECUTED FOR BOTH SECTION 97-3-19(2)(D) CAPITAL MURDER AND CONSPIRACY TO COMMIT CAPITAL MURDER CONSISTENT WITH THE DOUBLE JEOPARDY CLAUSES OF THE STATE AND FEDERAL CONSTITUTIONS.
The indictment in this case charged both Christopher Stewart and Ricky Selders with the following crimes:
on the 7th day of January, 1991 ... unlawfully, wilfully, feloniously, and of their malice aforethought, COUNT I, did, then and there, kill and murder one Roderick D. Ball a human being, and Christopher Stewart having been offered money by or received money from Ricky Selders for committing said murder of Roderick D. Ball in violation of section 97-3-19(2)(d) ... and,

COUNT II
did unlawfully, wilfully, and feloniously conspire, combine and confederate with one another to commit the murder of Roderick D. Ball, in violation of section 97-1-1 of the Mississippi Code.
Stewart was convicted and sentenced for both crimes. He received the death penalty for the capital murder charge and twenty years for the conspiracy to commit capital murder charge.
As a preliminary matter, the defendant's failure to object to the indictment did not bar this assignment of error on appeal as a valid objection did not exist before the jury returned its verdict. There is no double jeopardy violation by trying a defendant simultaneously on the two counts set forth in the indictment in the case at hand. Meeks v. State, 604 So.2d 748, 751 (Miss. 1992). The issue is whether a conviction for murder-for-hire capital murder under Miss. Code Ann. § 97-3-19(2)(d) (1972) may co-exist with a conviction for conspiracy to commit capital murder under Mississippi law.
A State may freely define crimes and prescribe punishments, but courts may not punish for an offense whose elements are completely enveloped by an offense for which a defendant has already been convicted. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). This Court has defined the rule set forth in Blockburger as follows:
If an individual is charged with two offenses, and all the elements of one are included within and are a part of a second greater offense, Blockburger intervenes. It charges that we compare statutory offenses, as indicated, and see whether each requires proof of a fact the other does not. *561 Meeks v. State, 604 So.2d 748, 751 (Miss. 1992). Conspiracy and the underlying substantive offense are normally distinct and separate offenses. Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 1181, 90 L.Ed. 1489 (1946); Griffin v. State, 545 So.2d 729, 730 (Miss. 1989). Nevertheless, there are times when a defendant may not be charged with both conspiracy and the substantive offense. Pinkerton, 328 U.S. at 643, 66 S.Ct. at 1181. "One is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime." Id.

Miss. Code Ann. § 97-3-19(2)(d) (1972) capital murder provision reads as follows:
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
(d) Murder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals.
We find that once the State has proven murder under this definition, no other evidence must be produced in order to establish the crime of conspiracy. Conspiracy to commit murder-for-hire is completely enveloped by our definition of murder-for-hire found in § 97-3-19(2)(d) of the capital murder statute.
In order to elevate Stewart's charge to capital murder, the State was required to show that Stewart had been offered or had received money for the murder of Ball. This necessarily involved the participation of at least two individuals. It was simply not possible for Stewart to have committed this category of capital murder alone. This reality is evidenced by the fact that each individual involved in the plan may be charged as a principal under this category of capital murder. The statute further requires that the motive for the murder be an offer or exchange of money. Certainly the act of exchanging or offering to exchange money in connection with the murder would not be possible without an underlying agreement.
In Meeks v. State, this Court held that the defendant was precluded from being punished for the kidnaping of one individual and capital murder of a different individual if the kidnaping offense was used to elevate a plain murder charge into a capital murder charge. Meeks, 604 So.2d at 754. The State has similarly utilized the murder-for-hire agreement between Selders and Stewart for two purposes in the case at hand, to secure a conspiracy conviction and to boost the murder charge to capital murder which also resulted in conviction.
Stewart may not twice be put in jeopardy for his agreement to kill Ball for money. The double jeopardy clause prohibits multiple punishments for the same offense. Lanier v. State, 635 So.2d 813, 818 (Miss. 1994), citing North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). Stewart could have been convicted for both plain murder and conspiracy to commit murder, but the conspiracy conviction may not stand where the agreement was utilized to elevate the murder charge and secure a capital murder conviction.
Normally, the agreement to commit an offense is not merged into the underlying substantive offense, but under the Mississippi Code, the murder-for-hire capital murder charge completely encompasses the agreement or conspiracy to commit this crime. The double jeopardy clauses of the state and federal constitutions prevent the State from punishing Stewart for both of these offenses.

III. THE TESTIMONY OF WILBERT ANDERSON WAS INADMISSIBLE HEARSAY, WAS NOT RELEVANT, AND WAS ERRONEOUSLY ALLOWED INTO EVIDENCE IN VIOLATION OF THE CONFRONTATION CLAUSE OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
Wilbert Anderson, an acquaintance of alleged co-conspirator Ricky Selders, testified that during a conversation which took place during the first week of December 1990, Selders offered him money to kill Ball. *562 Anderson testified that he refused the offer even though the offer had increased to $10,000 by the end of their conversation. Stewart argues that the testimony exposing Selders's offer to Anderson was inadmissible hearsay and not relevant to the prosecution's case against him.
Without addressing the issue of hearsay, we find that Selders's alleged offer to Anderson was not relevant to the case against Stewart. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. The statements would have been probative in a trial against Anderson had he been accused of conspiring with Selders, or in a trial against Selders as a principal to capital murder for hiring someone to kill Ball, but these statements fail to make it more believable that Stewart was involved in the murder. Neither Anderson nor Selders were on trial.
Nor was there any proof demonstrating the existence of a conspiracy between Stewart and Selders when Selders allegedly extended the offer to Anderson. The statements made at that time concerned Selders's intentions alone, and his intentions are not probative of the subsequent actions of Stewart.
This blatantly irrelevant evidence served to unduly prejudice Stewart and confuse the issues put before the jury. M.R.E. 403. The prosecution introduced so much evidence concerning the alleged behavior and intentions of Selders that, at times, it appeared as though he was the individual on trial. Anderson's testimony indicated the existence of criminal behavior between Selders and Anderson, but not the existence of behavior that was in any way attributable to the defendant in this case. This evidence was prejudicial to Stewart as he was the one actually on trial. See Hansen v. State, 592 So.2d 114, 133 (Miss. 1991) (concluding that admission of statements of non-testifying co-defendants or accomplices was highly prejudicial to defendant because of lack of opportunity for cross-examination).
The trial court erroneously permitted Anderson to testify that Selders offered him money to kill Ball for the purpose of preventing Ball from testifying against Selders in court. Regardless of whether the testimony was hearsay, the evidence was irrelevant and highly prejudicial because it involved conversations which transpired before the defendant allegedly became involved in a conspiracy, and the communications were made between two individuals not on trial. In a case where the evidence produced discrepancies and some conflicting inferences, this highly prejudicial testimony might have been the evidence which swayed a juror into deciding that Stewart was guilty. The admission of this testimony constituted reversible error.

IV. THE TRIAL COURT ERRED IN FAILING TO ALLOW CHRISTOPHER STEWART TO INTRODUCE EVIDENCE AT SENTENCING CONCERNING THE SENTENCE OF HIS CODEFENDANT.
Ricky Selders plea bargained and received a twenty year sentence for the crime of manslaughter. The trial court sustained the prosecution's motion in limine to prohibit the defense from introducing this fact to the jury at the sentencing phase of Stewart's trial. The trial court reasoned that the sentence imposed on Selders was not a relevant mitigating circumstance of Stewart's offense because their causes had been severed and should stand on their own merits.
Any evidence which does not bear on the defendant's character, prior record, or circumstances of his offense may be excluded. Lockett v. Ohio, 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973, 990 n. 12 (1978); Cole v. State, 525 So.2d 365, 371 (Miss. 1987). This Court has previously held that evidence of a co-defendant's sentence was not relevant evidence in the sentencing decision. Stringer v. State, 500 So.2d 928, 941-42 (Miss. 1986); Johnson v. State, 477 So.2d 196, 218 (Miss. 1985). The Florida Supreme Court has consistently held to the contrary  that the trial court's refusal to admit the separate sentence of a codefendant as a mitigating circumstance in the sentencing phase of the accused's trial was reversible *563 error. O'Callaghan v. State, 542 So.2d 1324, 1326 (Fla. 1989); Herring v. State, 446 So.2d 1049, 1056 (Fla. 1984); Messer v. State, 330 So.2d 137, 141-42 (Fla. 1976); Slater v. State, 316 So.2d 539, 542-43 (Fla. 1975).
Stewart argues that his case is more analogous to the Florida cases because they involved the admission of codefendants' plea bargained sentences, not codefendant sentences which were the result of jury verdicts as in the Mississippi cases, Stringer and Johnson. Stewart specifically directs our attention to the reasoning employed in Johnson in holding codefendant sentences inadmissible. The rationale was as follows:
Suppose, for example, the juries which tried [the co-defendants] had returned death penalty verdicts? Would the state, under any theory, have been permitted to show this over Johnson's objection? Each case tried by a separate jury must stand on its own. Otherwise, the jury trial is pointless.
Moreover, for the separate sentences of [the co-defendants] to have had any meaning in Johnson's, it would have been necessary to develop all the facts of each of their trials for this jury.
Johnson, 477 So.2d at 218. Stewart's position is made more persuasive by the fact that the Johnson case distinguished Messer and Slater on the grounds that the codefendant in those two Florida cases plea bargained instead of receiving sentences pursuant to a jury verdict.
If Selders had testified at trial, his plea bargain would certainly have been admissible as impeachment evidence because any agreement with the State might very well have affected his credibility in the eyes of the jury. We find no error, however, in the refusal to admit evidence of Selders' plea bargain when he did not testify at trial, especially after Stewart was offered the same plea bargain. He is essentially complaining about a deal which he turned down. With no evidence of disparate treatment by the prosecution, each case should be left to stand on its own merits before the jury. See Buckley v. State, 223 So.2d 524 (Miss. 1969) (permitting criminal defendant to object to admission of codefendant's plea bargain in rare situation where it is used against defendant since each case should stand on its own merits).
This Court's statutory authority of proportionality review not only requires this Court to compare capital cases in which the death penalty has been imposed or rejected, but also requires the Court to consider the sentences of other accomplices to the crime when the accomplices have received a penalty less than death. Culberson v. State, 379 So.2d 499, 510 (Miss. 1979). For example, in both Reddix v. State, 547 So.2d 792, 794 (Miss. 1989) and Bullock v. State, 525 So.2d 764, 770 (Miss. 1987), this Court held that a sentence of death was disproportionate for reasons including the fact that the codefendant ultimately received a life sentence.
If this Court may consider the sentence received by a codefendant, then why should the jury be deprived of such information? Because of the specific circumstances of an offense and the complicated task of assessing the culpability of a codefendant based upon his role in the crime, we find that the consideration of the codefendant's sentence in the case at hand is better suited for proportionality review.
Stewart's codefendant, Selders, received a sentence of 20 years in a plea bargain for manslaughter. Was Selders' sentence disproportional in light of the fact that Selders was the alleged instigator and chief beneficiary of the murder of Roderick Ball? It becomes an issue of whether the individual who instigated the crime is more culpable than the one who physically did the killing for money. Stewart's alleged participation in the crime was arguably greater because of this difference. On the other hand, based on the prosecution's theory, his culpability is arguably less because there would not have been a murder had Selders not desired and paid someone to kill Ball. The only conclusion that need be made in the present case that even though the jury was unaware of the plea bargain and sentence of Stewart's codefendant, its bearing on the sentence received by Stewart would have been carefully considered by this Court in its required proportionality review.

*564 V. THE SENTENCING VERDICT INSTRUCTION WAS DEFECTIVE IN A MANNER WHICH VIOLATES STATE LAW AND THE EIGHTH AMENDMENT.
Stewart argues that the failure to include a jury foreman signature line under the life imprisonment option in instruction S-1 had the effect of confusing the jury as to its authority to return a life sentence. In Jenkins v. State, 607 So.2d 1171, 1180 (Miss. 1992), this Court expressed concern with an instruction that provided a signature line under some of the sentencing options and not others. We were concerned that this irregularity might cause the jury to neglect the options not containing a space for the jury foreman's signature. Without really addressing the merits of this claim, the Jenkins Court simply advised the trial court to correct this error on remand as the case was reversed on other grounds.
The exact same error alone in sentencing instruction S-1 is not sufficient to require resentencing in the case at hand because the jury was presumed to have followed the court's instructions. However, the continued use of similar instructions will be grounds for reversal in the future.
The absence of a signature line under the life option in death penalty sentencing instructions apparently originates from the fact there is no statute requiring otherwise. Miss. Code Ann. § 99-19-103 (1972) requires the jury foreman to sign below the list of aggravating circumstances which warrant the imposition of the death penalty, but there is no parallel requirement under the life option. A sentencing instruction reflecting this difference is confusing on its face.
In the case at hand, the section dealing with the death option, including the lines for the list of aggravating circumstances and the foreman's signature, covered almost an entire page. The life option merely consisted of one and one-half lines at the very end of the instruction. Moreover, with no signature line under the life option, the jurors' attention was further drawn away from considering this alternative. The life option was somewhat buried in the intricacy of instructions relating to the death option. See Chenault v. Stynchcombe, 581 F.2d 444, 448 (5th Cir.1978) (holding that sentencing instructions must "clearly instruct the jury about mitigating circumstances and the option to recommend against death.").
The jury is expected to read the entire instruction and presumed to follow its mandates, but there is no justification to continue any practice which might create confusion for a jury expected to decide whether or not to impose a sentence of death. Accordingly, this facial defect in sentencing instructions in death penalty cases will no longer be tolerated by this Court. This facial defect may be cured simply by reversing the order of the options in the sentencing instruction so that the life option is listed first.

CONCLUSION
A conviction of murder-for-hire under Miss. Code Ann. § 97-3-19(2)(d) (1972) may not co-exist with a conviction for conspiracy to commit capital murder. However, both convictions in this case require reversal on the merits. The trial court arbitrarily denied Stewart the use of a peremptory challenge in refusing his request to strike the juror Lloyd from the jury. The lower court also erroneously admitted the irrelevant and highly prejudicial testimony regarding Selders' alleged offer to pay Anderson to murder Roderick Ball. This highly prejudicial testimony could have been the element which improperly produced a verdict of guilty and the imposition of the death penalty.
REVERSED AND REMANDED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and BANKS and McRAE, JJ., concur.
JAMES L. ROBERTS, Jr., J., concurs except as to issue IV.
SMITH, J., concurs in part and dissents in part with separate written opinion joined by JAMES L. ROBERTS, Jr., J.
PITTMAN, J., not participating.
*565 SMITH, Justice, concurring in part and dissenting in part:
I agree with majority that the case must be reversed and remanded for a new trial. However, I disagree concerning Issue IV and the majority's contention that it was error to prohibit the jury from being advised about the plea bargain sentence of twenty years that co-defendant Ricky Selders received.
The majority, at Stewart's urging, is revisiting and over ruling precedent case law of this Court in its determination of this issue. This Court has consistently followed and adhered to the principle that "What is important ... is an individualized determination on the basis of the character of the individual and circumstances of the crime." Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983). Evidence which does not bear on the defendant's character, prior record, or circumstances of his offense may be excluded. Lockett v. Ohio, 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973, 990 n. 12 (1978); Cole v. State, 525 So.2d 365, 371 (Miss. 1987).
The trial judge in the case sub judice ruled that Selders' sentence was not relevant to the sentencing decision that was to be determined by Stewart's jury, clearly following the Court's precedents of Stringer v. State, 500 So.2d 928, 942 (Miss. 1986) and Johnson v. State, 477 So.2d 196, 218 (Miss. 1985), wherein this Court determined that a co-defendant's sentence is not relevant to the individualized determination which the jury must make according to Zant.
The majority proposes to abandon the Mississippi precedent in favor of Florida law as argued by Stewart, citing Parker v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). The majority ignores that the issue squarely before the United States Supreme Court in Parker, however, was not whether a co-defendant's sentence was properly admitted as mitigating evidence in a capital death penalty case. It was clearly admissible under Florida law. The central issue before the United States Supreme Court in Parker was what effect the Florida court gave to Parker's mitigating evidence in rejecting a jury recommendation of a life sentence. Id. at 310-11, 111 S.Ct. at 733-34. Accordingly, there was no holding of admissibility or a stamp of approval on the admission of a co-defendant's sentence as mitigating evidence by the United States Supreme Court.
Next, the majority maintains that because of this Court's statutory mandate of proportionality review, comparing capital cases where the death penalty has been both imposed and/or rejected, as well as considering the sentences of other accomplices to the same crime when those accomplices have received less than a sentence of death, that the jury should be afforded the same information in determining sentence. The majority's new twist is strange indeed considering that this Court has consistently held, since Clemons v. State, 593 So.2d 1004 (Miss. 1992), that proportionality review is a totally separate function from the case on the merits as to guilt and/or sentencing in death penalty cases.
And, of course, as previously mentioned, the procedure is statutorily authorized in Florida, but is not under the Mississippi statutory scheme. Besides, even if the procedure of allowing for the jury to know of a co-defendant's sentence were allowed, the fact remains that Stewart was the killer, not Selders. This factor alone significantly and arguably places greater culpability upon Stewart. There remains the built-in statutory safeguard of proportionality review by this Court, which, regardless of the jury's determination, we would ultimately have to make in the final determination on review. I fail to see any error regarding this issue, but rather a mere attempt by the majority to re-visit and not only change precedent case law, but also allow by judicial decree a procedure that the Mississippi Legislature has not established as a statute.
I concur in part and dissent in part.
JAMES L. ROBERTS, Jr., J., joins this opinion.