## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-01817-SCT

*GREGORY HICKS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/17/2000 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER, JR. |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | H. LEE BAILEY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/14/2002 |
| MOTION FOR REHEARING FILED: | 2/27/2002; denied 4/4/2002 |
| MANDATE ISSUED: | 4/11/2002 |

### BEFORE McRAE, P.J., EASLEY AND GRAVES, JJ.

### EASLEY, JUSTICE, FOR THE COURT:

¶1. On January 22, 2000, Gregory Hicks (Hicks) was arrested for the murder of Danny Joe Rainey (Rainey) that occurred on January 21, 2000, in Montgomery County, Mississippi. On February 8, 2000, the Justice Court of Montgomery County bound Hicks over to the grand jury which indicted him. Trial commenced on October 16, 2000, before the Circuit Court of Montgomery County, Mississippi, Honorable Joseph H. Loper, Jr., presiding. The jury returned a guilty verdict. Hicks was sentenced to serve life in the custody of the Mississippi Department of Corrections. The trial court denied Hicks's motion for a new trial and, in the alternative, a judgment notwithstanding the verdict on October 18, 2000. Hicks timely perfected an appeal to this Court.

### FACTS

¶2. Rainey, a black male, was murdered on January 21, 2000, in Montgomery County, Mississippi. Hicks, a black male, was tried and convicted for Rainey's murder. Several eyewitnesses testified at trial.

¶3. Valerie Brewer (Brewer), a nurse, saw three men arguing outside. Brewer was on her way to visit her patient, Miss Allian Jones. The argument escalated into a physical confrontation. Hicks shoved Rainey and held a butcher knife over his head. Rainey ran, and the third man walked away. Rainey stumbled and fell. Hicks then straddled Rainey. Rainey lay in a fetal position with his hands over his head. Rainey yelled, "No." Hicks kicked Rainey and yelled, "Die, n----r, die." Hicks stabbed Rainey with the knife numerous

times. After stabbing Rainey, Hicks stopped and then resumed stabbing him. Brewer never saw a weapon of any kind on Rainey. Brewer had never seen Rainey before, but she had seen Hicks before when visiting her patient.

¶4. Lonza Williams (Williams) testified that on January 21, 2000, she was at the house of her cousin, Showanda Jones (Jones). Rainey was the father of Jones's baby, Lateesha Jones. Rainey and Hicks were involved in an argument over the child. Hicks, who lived with Jones, told Rainey he liked taking care of Rainey's baby. The argument became physical. Hicks went into the kitchen and got a knife. Rainey left the house to catch a ride with the mailman who was outside to get away from the argument. Rainey knew the mailman. Hicks followed him out the door.

¶5. Careesa Flemming (Flemming), another cousin of Jones at the house, hollered in a loud and scared voice for Williams to come help. Hicks was stabbing Rainey. Williams hollered for Hicks to stop. Hicks was in a position over Rainey who was on the ground. While stabbing Rainey, Hicks said that "he was tired of these punk ass n----rs coming down here trying to take over." Brewer did not see any weapon on Rainey. Rainey was trying to leave the altercation.

¶6. Flemming testified that Rainey and Hicks had been arguing about Jones's baby. Hicks told Rainey that he liked to hear the baby call him "daddy." After returning from the kitchen, the men began pushing each other and cursing. Hicks then started stabbing Rainey saying that, "I hope you die, motherf----r. I am tired of ya'll coming down here respecting -- disrespecting my house, what I say. This is where I lay my head at." [sic] Rainey was on the ground on his back. Flemming did not see Rainey with any weapon. Rainey was between Hicks's legs. Flemming saw Hicks leave the victim and go inside the house with the knife. She did not see the knife again. Hicks got his coat and left through the bushes near the train tracks.

¶7. Williams saw the bloody butcher knife. Williams identified the butcher knife as her butcher knife that had been in the kitchen. Hicks offered to return the knife to Williams and stated that "he hoped he killed him." Hicks left the scene with the knife.

¶8. David Eldridge (Officer Eldridge), Chief of Police in Kilmichael, responded to the call about the fight and stabbing. Rainey was still alive when Officer Eldridge arrived, but he died while being transported to the hospital. Officer Eldridge was informed that the fight began over Rainey's child. Hicks made a telephone call to Officer Eldridge on January 21, 2000, at approximately 4:00 p.m. at city hall claiming that Rainey had tried to stab him with a fan blade. Officer Eldridge never discovered any piece of fan blade that Hicks initially claimed that Rainey used to stab him.

¶9. On January 21, 2000, Hicks was apprehended at the Greyhound Bus Terminal in Jackson, Mississippi, and transported back to the jail in Vaiden. Sheriff Kenneth Campbell (Sheriff Campbell) did not recall seeing any scratches on Hicks when he was apprehended. Later, Hicks claimed that Rainey had a brick. Sheriff Campbell searched the crime scene for any fan blade or a brick that could have been used by Rainey, but neither were discovered. On January 22, 2000, after waiving his rights by signing the rights form, Hicks gave a statement. Sheriff Campbell and Ellis Bevis witnessed the signature. The statement was taken immediately after the waiver statement was signed. Hicks's statement was read to the jury. Hicks did not take the stand in his own defense.

¶10. Harold Gunn (Gunn) was called as a witness on behalf of Hicks. Gunn had been the third man present that day at Jones's house at the time of the altercation. Gunn testified that he witnessed the initial argument,

but he left to go to the store before Rainey was stabbed. Gunn claimed he never saw Hicks with any knife, but he stated on cross-examination that he heard Hicks rattle the knife in the knife drawer before going outside.

¶11. Dr. Steven Hayne (Dr. Hayne), state pathologist, testified about the autopsy he performed on Rainey. Dr. Hayne described Rainey's wounds as follows:

> To the chest and abdomen there were three injuries. There was a scraping of the skin or scratch called an abrasion measuring approximately one-half inch located over the upper right chest wall. There was also the presence of two cuts in the skin, each consistent of a stab wound. One located on the upper left abdominal wall, and there was a second one located even slightly higher on the right abdominal wall. The two injuries measured approximately seven-eights of an inch to three-quarters of an inch. They were essentially slit like, and each was consistent with a sharp-edged instrument producing those injuries.

¶12. Hicks was found guilty of murder and sentenced to a term of life imprisonment. Aggrieved, Hicks raises the following issues on appeal:

**I. Whether the verdict of the jury was against the overwhelming weight of the evidence.**

**II. Whether a new trial is required in the interest of justice.**

**III. Whether the trial judge should have granted the Motion for Dismissal of Charges because of a denial to the defendant of his Constitutional right to a speedy trial.**

**IV. Whether the trial judge erred in admitting the defendant's statement because of a failure to predicate that it was voluntary.**

**V. Whether the trial judge erred in denying the motion for the defendant to challenge the State's peremptory challenges to systematically exclude blacks from the jury.**

**VI. Whether the trial court erred in denying Hicks's Motion for a New Trial and in the alternative for a judgment of Acquittal Notwithstanding the verdict.**

## DISCUSSION

### I. Speedy Trial

¶13. On appeal, Hicks argues that he was denied his constitutional right to a speedy trial. Hicks made a pre-trial motion for dismissal of the charges due to the denial of his constitutional right to a speedy trial. The motion was filed on October 16, 2000, stating that Hicks was arrested by the Montgomery County Sheriff's Department on January 22, 2000, for the charge of murder. Hicks was arraigned on April 25, 2000, and trial was set for October 16, 2000. Hicks states that he was incarcerated for 268 days, primarily in the Rankin County Correctional Facility awaiting trial. Hicks complains he suffered "worries and anxieties" from being incarcerated prior to trial on the murder charge. Hicks claimed he was having a problem with depression.

¶14. After being arrested, Hicks had his probation for a prior conviction revoked, and he was incarcerated to serve the terms of that sentence. Thus, the time preceding trial that Hicks was incarcerated was for the

revocation of probation for a prior sentence not for the murder charge. Hicks's first indictment was fatally defective because it did not allege jurisdiction. Hicks was arraigned on the second indictment out of term. "Alleged speedy trial violations are examined and determined on a case-by-case basis due to the factual specifics of each action." *Brengettcy v. State*, 794 So.2d 987, 991 (Miss. 2001). *See also Sharp v. State*, 786 So.2d 372, 377 (Miss. 2001). The Court has "not set a specific length of time as being per se unconstitutional" in reviewing a constitutional challenge for lack of speedy trial. *Brengettcy*, 794 So.2d at 992.

¶15. This Court has recently examined the constitutional right to a speedy trial in *Mitchell v. State*, stating that pursuant to Miss. Code Ann. § 99-17-1 (2001), the 270 day speedy trial rule provides:

> Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned. "The right to a speedy trial is guaranteed by the sixth and fourteenth amendments to the United States Constitution and Art. 3, § 26 of the Mississippi Constitution of 1890." *Watts. v. State*, 733 So.2d 214, 235 (Miss. 1999). 'The constitutional right to speedy trial attaches at the time when the defendant is first effectively accused of the offense.' *Gray v. State*, 728 So.2d 36, 47-48 (Miss. 1998) (citing *Perry v. State*, 419 So.2d 194, 198 (Miss. 1982)). This Court has held this to begin at the "'time of a formal indictment or information or else the actual restraints imposed by arrest and holding to a criminal charge.'" *Perry v. State*, 637 So.2d 871, 874 (Miss 1994) (quoting *Lightsey v. State*, 493 So.2d 375, 378 (Miss. 1986)).

*Mitchell v. State*, 792 So.2d 192, 210 (Miss. 2001).

¶16. When a denial of the constitutional right to a speedy trial is claimed, the four-part balancing test of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), must be employed. *Mitchell v. State*, 572 So.2d 865, 870 (Miss. 1990); *Kinzey v. State*, 498 So.2d 814 (Miss. 1986). In *Taylor v. State*, 672 So.2d 1246, 1258 (Miss. 1996), this Court held:

> In analyzing the constitutional right to a speedy trial, we must again visit the familiar realm of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed. 2d 101 (1972), and apply the four factors to the present case. The four *Barker* factors, to be balanced in light of surrounding circumstances, are: (1) length of delay; (2) reason for delay; (3) defendant's assertion of the right to a speedy trial; and, (4) prejudice to the defendant resulting from the delay.

¶17. The first step in this proposition is for Hicks to satisfy the presumptively prejudicial element under *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed. 2d 101 (1972); *Smith v. State*, 550 So.2d 406, 408 (Miss. 1989). "The delay is the triggering mechanism" and "must be presumptively prejudicial" or the analysis is halted. *Jaco v. State*, 574 So.2d 625, 630 (Miss. 1990). *See also Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 2693, 120 L.Ed.2d 520 (1992).

¶18. Once the trial court has determined whether the defendant's incarceration is presumptively prejudicial to the defendant, the trial court must then examine the four factors laid out in *Barker*. The United States Supreme Court stated in *Barker* that, "until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530, 92 S.Ct. at 2191.

¶19. Here, the trial court determined that Hicks's incarceration for 268 days was presumed to be prejudicial and, therefore, required examination of the other factors to balance the delay. The trial court made a detailed analysis of the factors claimed for the delay for bringing Hicks to trial. The trial record reflects as follows:

By the Court: Well, in the speedy trial motion the [C]ourt has to consider several factors before it can -- before determining whether or not the case should be dismissed. The [C]ourt's first factor is the defendant has been incarcerated for more than eight months. That is presumptively prejudicial under numerous cases from the state supreme court and federal courts as well. So it is presumed to be prejudicial, but there are factors the [C]ourt first has to look at. Length of delay. It has been not quite nine months. Few days less than nine months since he was originally charged and you begin the date someone is effectively accused of a crime, which is January 22. When he was arrested he was certainly accused at that point. [C]ourt also has to look at reason for delay. The [C]ourt's concerned about the argument the State made about the fact that it's delayed just because he was already in jail, but I can take judicial notice of the main reason for delay, although it was not stated by the State, is we only have two terms of court in this county each year. Now, the terms of court start the third Monday in April and the third Monday in October. And -- I'm sorry. The second Monday in April and the second Monday in October. This is a district that has seven counties and eight courthouses because one of the counties has two judicial districts. So there are just not but two terms of court a year here in Montgomery County. So the main reason for the delay is the court is not in session over here except in October and April. He was not arraigned on this charge until after the term of court had ended. So the next term available was this October term.

Now, I do say the State could have done a little better job in the original indictment. If the State had not made a mistake in the original indictment there is a possibility he could have been tried in the April term of last year, of this past year of 2000 on the original indictment that was defective. But I find that the length of -- the reason for delay is court scheduling and court crowding of the docket all over the Fifth Circuit.

The [C]ourt does see he did assert the right to speedy trial by filing a motion, but the Court has no knowledge of that motion ever being called up for a hearing. As far as I know it was never called up for a hearing. Was it, Mr. Bailey?

By Mr. Bailey: No, sir.

By the Court: And I -- of course, the motion is filed, but I think like any motion if it's not -- if it's not brought up for a hearing it can be considered waived. And certainly if this [C]ourt had had this motion presented to it, it could have found time in vacation to come over here and try this case if this assertion had been made to this [C]ourt.

But the final thing and I think the factors that the [s]upreme [c]ourt has said we must look at probably more diligently than others is prejudice to the defendant. One of the reasons for prejudice or one of the factors considered is whether or not there is pretrial incarceration. There was pretrial incarceration, but it was because the fact the defendant was revoked out of Hinds County on some previous charges. So his incarceration is not due to this case. It's due to the fact he was not eligible for bond because he was incarcerated on other charges.

The Court also has to look at whether or not there is anxiety or the purpose or anxiety should be minimized. There has been some testimony that he had some anxiety, but testimony further stated that he has been in depression since 1999. He was receiving medication for depression during that time and was even ordered by Judge Yerger to continue treatment for depression after he was first released in 1999.

And also the [C]ourt is of the opinion that rather than writing the state bar, if he had some complaint all had he to do is write his lawyer about his case.

And the main factor is whether there has been actual prejudice caused by this delay. There was some concern about whether some witnesses could be located that was brought to this [C]ourt's attention last Thursday. I understand those witnesses are available, can testify if they are needed.

There has been absolutely no showing the defendant is going to be prejudiced in any way by this nine-month delay or not quite nine-month delay. There is no impairment of his defense at all. And so when I weigh those factors that I must consider and weigh them all, weighing probably more heavily the idea about whether or not there is prejudice, but also factoring in those other factors, the [C]ourt just finds there has not been a speedy trial delay that would necessitate this case being dismissed. So the motion to dismiss on grounds of speedy trial is denied.

¶20. Here, considering that the *Barker* factors were examined by the trial court, this Court finds that the trial court did not err in overruling Hicks's motion to dismiss for a lack of being afforded a speedy trial. Furthermore, Hicks waived his motion to dismiss by not prosecuting his motion, and Hicks also suffered no identifiable prejudice from the incarceration. This issue is without merit.

## II. Peremptory Challenges

¶21. The State exercised five of the six peremptory challenges against potential jurors of the African-American race. The five potential jurors who were struck are A. H. (S-1), C. Y. (S-2), Y. M. (S-3), W. L. C. (S-5) and L. S. (S-6). Hicks contends that the trial court erred in finding that the State could exercise its peremptory challenges on jurors A.H., C.Y., Y.M., W. L. C. and L. S.

¶22. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that a peremptory challenge cannot be used to exclude venire-persons from jury service based on their race. A peremptory challenge based on race constitutes a violation of equal protection. *Id*. at 98, 106 S.Ct. at 1723-24. Since the *Batson* ruling in 1986, the United States Supreme Court and this Court have extended the use of the rule to other circumstances. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S.Ct. 1419, 1422, 128 L.Ed.2d 89 (1994) (*Batson* extended peremptory challenges based on gender); *Georgia v. McCollum*, 505 U.S. 42, 54, 112 S.Ct. 2348, 2356, 120 L.Ed.2d 33 (1992) (defendant's use of peremptory challenges based on racial consideration was prohibited); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628-29, 111 S.Ct 2077, 2087, 114 L.Ed.2d 660 (1991) (*Batson* extended to civil cases); *Powers v. Ohio*, 499 U.S. 400, 415-16, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991) (race-based challenges by the State without regard to the race of the defendant prohibited); *Thorson v. State*, 721 So.2d 590, 594 (Miss. 1998) (*Batson* extended to peremptory strikes based on religion).

¶23. The necessary steps to resolve a peremptory challenge based upon *Batson* are cited in *Stewart v.*

*State*, 662 So.2d 552, 557-58 (Miss. 1995) as follows:

1. The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge.

2. If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror.

3. The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of peremptory challenges.

¶24. The United States Supreme Court in *McCollum*, extended *Batson* and held that "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges." 505 U.S. at 59, 112 S.Ct. at 2348. Ordinarily, the first step in analyzing the peremptory challenge is to determine "whether there was a prima facie showing that race was the motivation for the State's peremptory challenges." *Woodward v. State*, 726 So.2d 524, 530 (Miss. 1997).

¶25. The United States Supreme Court has held that peremptory challenges are not of constitutional dimensions and that the challenges are a means to achieve the end of an impartial jury. *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80, 90 (1988).

¶26. This Court in *Stewart*, 662 So.2d at 557, stated that:

The right to peremptory challenges is not mandated by the federal constitution, but is instead a state created right. *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988). A state may place restrictions on the use of peremptory challenges because it is a state created right. *Id*.; *See also* *Mettetal v. State*, 615 So.2d 600, 603 (Miss. 1993) (requiring defendant to use peremptory challenges to cure erroneous denials of challenges for cause). However, the arbitrary denial of a state right rises to a violation of the due process clause of the Fourteenth Amendment. *Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S.Ct. 2227, 2229, 65 L.Ed.2d 175 (1980).

¶27. In *Woodward*, this Court stated the "next step is to determine whether the prosecution met its burden of showing sufficient race-neutral explanations for its strikes." 725 So.2d at 529-30. "A peremptory challenge does not have to be supported by the same degree of justification required for a challenge for cause." *Stewart* 662 So.2d at 558. It is not necessary to meet the same standard of examination as a challenge for cause for a peremptory challenges. *Id*.

¶28. This Court has held that the trial judge is afforded great deference in determining if the expressed reasons for exclusion of a venire-person by a challenged party is in fact race-neutral. *Tanner v. State*, 764 So.2d 385, 393 (Miss. 2000). In *Stewart*, this Court held that "one of the reasons the trial court is granted such deference in a *Batson* issue is because the demeanor of the attorney making the challenge is often the best evidence on the issue of race neutrality." 662 So.2d at 559. Furthermore, the determination of discriminatory intent will likely turn on a trial judge's evaluation of a presenter's credibility and whether an explanation should be believed. *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). In *Stewart*, this Court also, held that "[d]espite the importance of demeanor evidence, the trial court must consider all the relevant circumstances, such as the way prior peremptory

strikes have been used and the nature of the questions poised on voir dire." 662 So.2d at 559 (citing *Griffin v. State*, 607 So.2d 1197, 1202 (Miss. 1992)). A reversal will only occur if the factual findings of the trial judge appear to be "clearly erroneous or against the overwhelming weight of the evidence." *Tanner*, 764 So.2d at 393 (citing *Stewart*, 662 So.2d at 558; *Davis v. State*, 551 So.2d 165, 171 (Miss. 1989)).

¶29. Here, the trial court had the opportunity to witness the challenges and observed the demeanor of all involved and all other relevant circumstances in the case. The trial court's findings are not clearly erroneous or against the overwhelming weight of the evidence. The trial court made a prima facie determination and required the State to set forth race-neutral reasons since five peremptory challenges were against members of the black race. The trial court found that there was a disproportionate exclusion by members of the black race to establish a prima facie showing requiring race-neutral reasons for the strikes to be placed on the record. The trial court conducted a race neutral analysis. The record reflects the following:

By the Court: State can go first.

By the State: Do you want me to do all of mine and him do all of his?

By the Court: You go through all of yours first.

By the State: S-1 was [A. H.]. Harold Gunn is his uncle, and he spoke to Harold Gunn before the trial. While the state did provide Harold Gunn's name in discovery, he is not a witness sympathetic to the State. The fact that he went up and talked to him as well as being related to him and unsympathetic to us was the reason we struck S-1.

By the Court: I find that to be race-neutral.

By the State: [C. Y.] was struck because he is related to -- according to Johnny Hargrove, chief of Winona police, he is related to some criminal element in the community,as well as, living in the Kilmichael community at the time this had happened.

By the Court: I find that to be race neutral.

By the State: Number 11 is [Y. M.]. [Y. M.] has had countless problems with the police department. We can put on Kilmichael or Winona police department officers to state that she is always calling them up, yelling at them, telling them how awful they are. We don't think she could give us a fair shot with any police officer.

By the Court: Okay. I find that to be race neutral.

By the State: S-4 is a white male, Your Honor. We understand he is very slow, and that's why we struck him.

By the Court: I find that to be race neutral.

By the State: Number 21 is [W. L. C.]. He is, according to Johnny Hargrove, Winona Police Chief, the uncle of the Simpsons and Goldens. The Golden, Golden -- you may remember the cases where they stole the cars.

By the Court: I remember them well.

By the State: So for that reason we don't think he would be a good juror for the State.

By the Court: I find that to be race neutral.

By the State: [L. S.] is a black male. He has mental problems according to Mr. John Johnson. John said that when he was police chief he has had numerous encounters with [L. S.], and that he is mentally unbalanced.

By the Court: I find that to be race neutral.

By the State: And number 30 was SA-1. That's [J. E. H.]. he is also a cousin of Harold Gunn, and it would be the same as juror number one. We just don't [sic] -- Harold Gunn may be disclosed by us as a witness, but we [sic] don't feel he is favorable to the State in his disposition.

By the Court: I find that to be race neutral as well.

¶30. The trial court did not err in allowing the State to exercise its peremptory challenges as to jurors, A. H., C. Y., Y. M., W. L. C. and L. S. The State set forth valid race neutral reasons for striking the potential jurors. This issue is without merit.

### III. Confession

¶31. On appeal, Hicks alleges that the trial court erred by admitting his signed confession made at the jail in Vaiden following his capture. Sheriff Campbell testified that he read Hicks's rights to him, and Hicks was allowed to read the waiver before signing. Hicks signed the waiver of rights. Sheriff Campbell testified that the statement was taken immediately after the waiver of rights form was signed and that Hicks "was not offered anything, and he was not threatened." The trial court admitted the confession into evidence.

¶32. "The voluntariness of a waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances." *O'Halloran v. State*, 731 So.2d 565, 570 (Miss. 1999). "The applicable standard for determining whether a confession is voluntary is whether, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Herring v. State*, 691 So.2d 948, 956 (Miss. 1997). The determination of whether a statement should be suppressed is made by the trial judge sitting without a jury as the finder of fact. *Id*. "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Balfour v. State*, 598 So.2d 731, 742 (Miss. 1992). *Accord*, *Palm v. State*, 748 So.2d 135, 142 (Miss. 1999). In other words, this Court has held that it will not reverse a trial court's "finding that a confession was voluntary and admissible as long as the trial judge applies the correct principles of law and the finding is factually supported by the evidence." *Palm*, 748 So.2d at 142. *See Greenlee v. State*, 725 So.2d 816, 826 (Miss. 1998)(citing *Haymer v. State*, 613 So.2d 837, 839 (Miss. 1993)). "Where, on conflicting evidence, the court makes such findings, this Court generally must affirm." *Lesley v. State*, 606 So.2d 1084, 1091 (Miss. 1992). *See also Dancer v. State*, 721 So.2d 583, 587 (Miss. 1998)(citing *Morgan v. State*, 681 So.2d 82, 87 (Miss. 1996)).

¶33. On appeal, Hicks argues that the trial court did not conduct a factual inquiry into the voluntariness of

the waiver of rights form. If the voluntariness of a confession is in question, the accused has a right to determine if the confession was actually voluntary in nature. *Kilcher v. State*, 753 So.2d 1017 (Miss. 1999). In *Agee v. State*, 185 So.2d 671, 673 (Miss. 1966), the procedure was set forth which requires an evidentiary hearing. *Id*. The State has the burden of proving all facts prerequisite to admissibility beyond a reasonable doubt. *Id*. (citing *Cox v. State*, 586 So.2d 761, 763 (Miss. 1991); *Neal v. State*, 451 So.2d 743, 753 (Miss. 1982). "This burden is met and a prima facie case made out by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward." *Id*. (quoting *Cox v. State*, 586 So.2d 761).

¶34. In the instant case, Hicks did not challenge the voluntariness of the confession until after it had already been read to the jury. Hicks did not seek to exclude the statement by bringing a pretrial motion to suppress the statement, nor did he object to the State's admission of the waiver of rights form. Hicks solely objected to reading the waiver of rights form to the jury unless it first was in evidence.

¶35. Here the State, in turn, then offered the waiver of rights form into evidence. The trial court admitted the waiver of rights form into evidence. When questioned by the State, Sheriff Campbell's testimony as to obtaining the statement from Hicks was in pertinent part as follows:

By Campbell: We transported him back to the Vaiden facility jail.

By the State: When was the next time you saw Gregory Hicks after that?

By Campbell: The next afternoon.

By the State: And why did you see him?

By Campbell: Went down to take a statement from him.

By the State: And did you get a statement from him?

By Campbell: Yes, I did.

By the State: I show you what's been labeled State's Exhibit 3 for identification. Do you recognize that?

By Campbell: Yes, sir. It's the rights form where I read him his rights and then allowed him to read it. He signed it.

By the State: Would you read that form for the jury, please?

By Campbell: Yes, I will. This is advice of your rights. Took place in the Carroll Montgomery Facility. The date. The time. Before we ask you any questions you must understand your rights. You have the right - ....

By the State: If you could, please continue, Sheriff.

By Campbell: Before we ask you questions you must understand your rights. You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If

you cannot afford a lawyer one will be appointed for you before any questions, if you wish. If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering any time until you talk to a lawyer. Below that is waiver of rights. It states I have read this statement of my right and I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this. I understand and I know what I'm doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. It's signed Gregory Hicks. It's witnessed by myself and Ellis Bevis.

By the State: Ellis Bevis was there with you.

By Campbell: Yes.

By the State: Once you read that to him and he read it, do you think he understood what it said?

By Campbell: Yes, sir.

By the State: Did he give you a statement?

By Campbell: Yes, sir, he did.

By the State: I show you what's been labeled as State's Exhibit 4 for identification, ask you if you know what that is.

By Campbell: Yes, sir. This is the statement he gave myself and Ellis Bevis. Ellis typed it.

By the State: I notice on each page there is a "G.H." in handwriting at the top and bottom corner on all three pages; is that correct?

By Campbell: Yes, it is.

By the State: Whose initials are they?

By Campbell: Gregory Hicks.

By the State: Did he write those initials on there?

By Campbell: Yes, he did.

By the State: Did he sign it?

By the Campbell: Yes, he did.

¶36. The State offered Hicks's statement into evidence. The following exchange occurred on the record:

By the State: Your Honor, we move the statement into evidence.

By the Defense: Your Honor, I believe they have to make a showing that it was voluntarily done, without any coercion, promises or any --

By the Court: Well, he has already offered a waiver of rights that the defendant signed. So I think he

has offered sufficient proof to allow the statement into evidence, and I'll allow it to be admitted.

By the Defense: Your Honor, may I approach the bench?

(The State and the Defense approach the bench for the following bench conference had outside the hearing of the jury.)

By the Defense: For the record I make a (motion for) mistrial on, on that ruling for Mr. Hicks because he did not show that it was voluntary with no promises of reward or anything, there was no promise of reward or coercion. There was no showing on that so I make a motion for mistrial.

By the Court: Waiver of rights form, as I understand it, hand it to me, it has that it was not --

By the State: It does have that on there, Judge. He testified that he understood that and signed that.

By the Court: Waiver of rights form signed by the defendant says I read the statement. I understand my rights. I'm willing to make a statement to answer questions. I don't want a lawyer at this time. No promises or threats have been made to me and no pressure or coercion of any kind has been used. So I, you know, don't see that you've got a valid objection. Your motion for mistrial is overruled.

Now, Mr. Bleck (the State), to clear up anything, you might want to ask if this statement was made immediately after this waiver of rights was signed.

By the State: Okay.

(The Bench Conference was concluded).

By the State: Was that statement taken immediately after his rights waiver was signed?

By Campbell: Yes.

By the State: And did you offer him any hope of reward, or did you threaten Mr. Hicks in any way?

By Campbell: He was not offered anything, and he was not threatened.

By the State: I now move the statement into evidence, Your Honor.

By the Court: I'll allow it to be admitted.

¶37. The trial court overruled Hicks's motion for mistrial. The trial court heard testimony from Sheriff Campbell before making its ruling. Hicks never filed a motion to suppress the statement or testified as to the voluntariness of the statement. Sheriff Campbell testified that no one had hurt, threatened, or promised anything to Hicks or coerced him to make a statement. A voluntary waiver of rights form was signed by Hicks before the statement was made. The trial court's finding was not manifestly wrong or clearly erroneous nor was the wrong legal standard applied. Hicks has not met the burden of establishing that the trial court abused its discretion in denying the motion for mistrial. This issue is without merit.

## IV.

¶38. Hicks argues that the jury's verdict was against the overwhelming weight of the evidence presented by

the testimony of the eyewitness at trial warranting reversal. The standard of review in determining whether a jury verdict is against the overwhelming weight of the evidence is set forth as follows:

> This Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court had abused its discretion in failing to grant a new trial.

> Only in those cases where the verdict it so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.

*Dudley v. State*, 719 So.2d 180, 182 (Miss. 1998).

¶39. This Court has held that "the motion for a new trial is addressed to the sound discretion of the trial court."*Burge v. State*, 472 So.2d 392, 397 (Miss. 1985). The credible evidence consistent with [a defendant's] guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. *McClain v. State*, 625 So.2d 774, 778 (Miss. 1993). *See Van Buren v. State*, 498 So.2d 1224, 1228 (Miss. 1986). This Court stated it will reverse only when it is convinced that the trial judge has abused his discretion. *Malone v. State*, 486 So.2d 360, 366 (Miss. 1986); *Quinn v. State*, 479 So.2d 706, 710 (Miss. 1985).

¶40. In *Benson v. State*, 551 So.2d 188, 193 (Miss. 1989), this Court held that factual disputes are properly resolved by the jury in a criminal prosecution and do not mandate a new trial. The jury is the trier of witness credibility. *Collier v. State*, 711 So.2d 458, 462 (Miss. 1998). Jurors are permitted to, and have a duty to, resolve conflicts in testimony they hear. *Groseclose v. State*, 440 So.2d 297, 300 (Miss. 1983); *Gandy v. State*, 373 So.2d 1042, 1045 (Miss. 1979). "[Jurors] may believe or disbelieve, accept or reject, the utterances of a witness." *Gandy*, 373 So.2d at 1045. There is no formula that dictates the juror's decision in resolving conflicts in testimony of the witness. *Id*. The jury is the final arbiter of a witness's credibility. *Morgan v. State*, 681 So.2d 82, 93 (Miss. 1996). The jury weighs the weight and worth of any conflicting testimony. *Williams v. State*, 757 So.2d 953, 957 (Miss. 1999).

¶41. In the case sub judice, multiple eyewitnesses testified at trial as to the argument that resulted in Rainey's death at the hands of Hicks. Brewer testified that she never saw Rainey with a weapon. Hicks straddled Rainey and stabbed him repeatedly with a butcher's knife. Brewer heard Hicks yell, "Die, n----r die." Williams witnessed the argument inside that eventually moved outside. Hicks carried Williams's butcher knife out of the kitchen and went outside. Williams identified the knife. The witness testified that the argument began over Rainey's child. Flemming testified that while stabbing Rainey, Hicks stated that "he was tired of these punk a-- n----rs coming down here trying to take over." Flemming heard Hicks say that he hoped Rainey died. Flemming never saw Rainey with a weapon during the altercation.

¶42. Williams testified that Hicks offered her butcher knife back to her. The knife was covered with blood. Williams refused the knife. Hicks told Williams that "he hoped he killed [Rainey]."

¶43. This proposition is without merit and is denied. Clearly, the verdict was not contrary to the overwhelming weight of the eyewitness testimony presented by the State at trial.

## V.

¶44. On appeal, Hicks finally alleges that the trial court erred in overruling his motion for judgment of acquittal notwithstanding the verdict (JNOV) or in the alternative for a new trial. The only new allegation

made by Hicks in support of this claim is that the law enforcement officers involved in the case did not properly secure the crime scene in order to preserve evidence. Hicks does not elaborate on the alleged deficiencies made by the law enforcement. Hicks also merely notes that the following previously addressed allegations further demand JNOV:

  1. Denying the motion to dismiss for lack of speedy trial;

  2. *Batson* challenges;

  3. Introduction of Hicks's statement;

  4. Jury verdict contrary to the overwhelming weight of the evidence.

¶45. The State properly counters that Hicks has not presented or argued the question of the sufficiency of the evidence. Hicks has confused the legal principles governing the sufficiency of the evidence and the weight of the evidence previously addressed by this Court.

¶46. The standard for review for a JNOV and a directed verdict are the same and implicate the sufficiency of the evidence. *Sheffield v. State*, 749 So.2d 123, 125 (Miss. 1999). This Court in *McClain v. State*, 625 So.2d at 778, held that a motion for JNOV, motion for directed verdict and a request for peremptory instruction challenge the legal sufficiency of the evidence. *See also* *Coleman v. State*, 697 So.2d 777, 787 (Miss. 1997)(standard of review for denial of directed verdict, peremptory instruction, and JNOV are identical). "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court. This occurred when the circuit court overruled [the] motion for JNOV." *McClain*, 625 So.2d at 778 (citing *Wetz v. State*, 503 So.2d 803, 807-08 (Miss. 1987)).

¶47. On the issue of legal sufficiency, this Court held in *Pinkney v. State*, 538 So.2d 329, 353 (Miss. 1988), that reversal can only occur when evidence of one or more of the elements of the charged offense is such that "reasonable and fair minded jurors could only find the accused not guilty." (citations omitted). In conducting this review, the evidence favorable to the State is accepted as true, and the State is given the benefit of all reasonable inferences flowing from that evidence. *Hammond v. State*, 465 So.2d 1031, 1035 (Miss. 1985); *Groseclose v. State*, 440 So.2d at 300. This Court has held that it may reverse only where reasonable and fair-minded jurors could not find the accused guilty as to one or more of the elements of the offense. *Pinkney*, 538 So.2d at 353. The jury is the final arbiter of a witness's credibility. *Morgan v. State*, 681 So.2d at 93. The jury weighs the weight and worth of any conflicting testimony. *Williams v. State*, 757 So.2d 953, 957 (Miss. 1999).

¶48. In the case sub judice, the State proved every element of the crime of murder. Hicks does not attack any specific element as not being satisfied. At best, Hicks attempts to make an argument that the cumulative errors at trial denied him a fair trial, thereby requiring JNOV. None of Hicks's individual allegations amount to reversible error. Therefore, there is no cumulative error on the part of the trial court. "Where there is not reversible error in any part, ... there is not reversible error to the whole." *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).

¶49. This issue is without merit.

## CONCLUSION

¶50. For these reasons, the judgment of the Montgomery County Circuit Court is affirmed.

¶51. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SAID SENTENCE SHALL RUN CONSECUTIVELY TO ANY SENTENCE PREVIOUSLY IMPOSED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ, CARLSON AND GRAVES, JJ. CONCUR.**