# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-00282-SCT

*WILLIAM A. C. SMITH a/k/a WILLIAM CHRISTOPHER SMITH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 2/2/2001 |
| TRIAL JUDGE: | HON. GEORGE B. READY |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WANDA TURNER-LEE ABIOTO |
| | JACK JONES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | ANN LAMAR |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/03/2002 |
| MOTION FOR REHEARING FILED: | 10/30/2002 |
| MANDATE ISSUED: | |

**BEFORE McRAE, P.J., EASLEY AND GRAVES, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. In 1998, the grand jury of DeSoto County, Mississippi, indicted William A. C. Smith, a/k/a William C. Smith a/k/a Mustapha Amin (Smith) for the murder of Georgette Theragood (Theragood) on or about January 28, 1998, in DeSoto County, Mississippi.

¶2. After a trial, a DeSoto County Circuit Court jury returned a guilty verdict against Smith, and the trial court sentenced Smith to life imprisonment without the possibility of probation or parole as a habitual offender in the custody of the Mississippi Department of Corrections.

¶3. The trial court denied Smith's motion for J.N.O.V. or alternatively, new trial, and Smith now appeals to this Court.

## FACTS

¶4. On March 28, 1998, Lucky Faulkner (Faulkner), a Hernando police officer, received a call from two males regarding a body they had found. The two men showed Faulkner a body on Christopher Lane in DeSoto County, Mississippi. The body was found in a ditch covered with leaves and dirt and was taken to Jackson, Mississippi, for an autopsy by Dr. Steven Hayne's (Dr. Hayne) office.

¶5. Dr. Hayne, pathologist for the State, received a request from Coroner Billy Baldwin from DeSoto County to perform an autopsy on a Jane Doe. Based on the body decomposition the decedent was dead for a period of time. There were two gunshot wound in the back of the head above the right ear. A bullet, copper jacket and lead core from the bullet was recovered from the head. She died from the two gunshot wounds to the head. The condition of the body would be consistent of a body being there for two months. Dr. Gary Stuhlmiller performed a DNA test of George Theragood (George) and Lyndell Lucero (Lyndell), parents of Theragood, the suspected deceased. The doctor compared the parent's DNA to the jawbone purported to be Theragood. Based on the test, there was a 99.68% probability of paternity.

¶6. On January 25, 1998, Lyndell had her last contact with her daughter. Lyndell lived in New Mexico. She did not perceive any problems when Theragood left to go to Texas. Lyndell's understanding on the 25th was that Theragood was going to Texas and that she was with Smith. Smith was going to take Theragood to Texas to see Larz Batiste (Larz), the father of Theragood's daughter, Shayna.

¶7. Lillian Sandoval (Sandoval), Theragood's grandmother, last spoke to Theragood by telephone on January 26. However, on February 6, 1998, Sandoval gave a missing person's report to the New Mexico police. George, who also lived in New Mexico, last spoke to Theragood on January 25, 1998.

¶8. On January 28, 1998, Randy Wallace (Wallace), a friend of Smith, met Smith at a car wash in Memphis, Tennessee. A young woman and baby was with Smith. The young woman and baby stayed at Wallace's house with his wife, while he and Smith went to see Smith's half-brother, Terry Smith (Terry) at his home. Wallace testified that they were at Terry's house approximately 30-35 minutes. When Smith left, Wallace thought that Smith, the woman and the child were going back to Texas.

¶9. Thelma Smith (Thelma), the stepmother of Smith, and Terry testified that Smith visited them on January 28, 1998. Smith came to the house sometime in the late evening with a male friend. They stayed a while and then left. Smith left in a black vehicle. According to Thelma and Terry, Smith called the next day and asked if they would baby-sit Theragood's daughter for him.

¶10. On the morning of January 29, 1998, Nauri Bakshi (Bakshi) was the general manager of the Days Inn of Memphis where a man named A. C. Smith checked into the hotel. He stayed for three nights. Smith had a little girl with him. Bakshi never saw a woman with Smith. Arlindo Bennett (Bennett), the front office manager at Days Inn, actually checked Smith into his room on January 29, 1998, in mid-morning. Only a small child was with him. Bennett also saw Smith check out on February 1, 1998. She thought the child was in daycare. Bennett heard Smith tell the housekeeper that the child's mother was an entertainer and was on tour for two months. He drove a black Mountaineer. Bennett identified Smith and the child as the two at the hotel.

¶11. On January 30, 1998, a man, identified as Smith, came into the Hampton Inn on Sycamore View in Memphis at approximately one to two o'clock p.m. Valerie Dodson (Dodson) was the employee at the hotel. The man stated that he wanted to make reservations for some of his employees. He asked if he could leave some luggage because they would not be arriving until about midnight. He left the luggage and after

three days the hotel employees looked through the bags and found a prescription for baby ointment. Dodson identified Smith as the man that came to the hotel and left the luggage. She also identified items left at the hotel. An FBI agent was called to pick up the items of luggage at the hotel.

¶12. On or about January 30 or 31, 1998, Smith called Marcie Ford (Ford), a child care professional, to inquire about her child care services. Ford identified Smith as the person who came to her house and left Shayna with her for the night. Smith told Ford that Shayna's mother was in jail. He also left a baby bag with Ford.

¶13. On Sunday, February 1, 1998, Luke Batiste (Luke), brother of Larz, was at his mother's home. Luke received a telephone call from a man named Mustapha, who stated that he was an attorney from Las Vegas. The man gave Luke the telephone number of Ford where Shayna was staying. Luke called Larz and gave him the information.

¶14. Larz is a policeman in Houston, Texas. The last time Larz spoke to Theragood, she was going to return to Texas to reconcile. When Luke gave Larz the information concerning the telephone call about Shayna, he called Ford to inquire about his daughter. Ford thought that Smith was Shayna's father, and she called the police after speaking with Larz. Following the conversation with Ford, Larz called George to tell him the situation. When George received the phone call from Larz, he went to Memphis to get Shayna.

¶15. Prior to being picked-up by her grandfather, Shayna was brought to the juvenile court in Memphis on February 2, 1998. Betty Smith found twelve .38 special bullets in Shayna's baby bag. Ronnie Clark (Clark), manager of the Shelby County Juvenile Court, had the bullets which were turned over for protective custody. Clark turned the bullets over to FBI agent Bill Rasmussen. The baby bag was subsequently released to the grandparents the next day.

¶16. On February 6, 1998, John Feltman (Feltman), deputy sheriff with Broward County, Florida, was working at the Fort Lauderdale Hollywood International Airport. An alarm went off by a magnimeter, which detects metal, like an x-ray machine. Upon inspection, Feltman saw a firearm in the bag. The gun was in a potato chip bag wrapped in a white towel. The weapon in the bag was a .38 caliber revolver, manufactured by Rohn Manufacturing.

¶17. Later that day, a man came to claim the bag. Feltman identified Smith as the man that spoke to him. Smith told Feltman that his name was Mustapha Amin. The FBI arrived while Feltman was interviewing Smith. Smith told Feltman that the bag belonged to a sect member who Smith sponsored in his religious group. Smith claimed the property belonged to the sect not the individual. FBI Agent Clint Fraley (Fraley) took some prints from Amin (a.k.a. Smith). Fraley also identified Smith. Once an investigation started, Fraley received information concerning Smith and his ties to New Mexico and Memphis, Tennessee.

¶18. Terry Amburgey (Amburgey), an FBI fingerprint specialist, tested fingerprints from the items from Florida. Amburgey testified that two of the four sets of fingerprints on the potato chip bag belonged to Smith. Smith's fingerprints were also found on a bottle, black soap dish, fingernail clipper and numerous other documents. None of Smith's fingerprints were found on the battery, antiseptic bottle, brush, comb or swabs.

¶19. James Cadigan, an FBI firearms identifier, compares the bullets and cartridge cases with firearms to determine if ammunition was fired from a particular firearm. He performed a comparison of the firearm

retrieved by Miami FBI in 1998, a Rohn .38 caliber revolver. This gun had 8 grooves. Cadigan also received hydroshock bullets from the FBI in Memphis, Tennessee. He also received the bullet fragments from Jackson, Mississippi, and he was asked to compare them. He determined that the bullet fragments could have been fired from the gun, but he did not positively identify it.

¶20. On February 26, 1998, Earl Heator (Heator), a Nashville police officer, received a call to go to the Crown Plaza Hotel in Nashville, Tennessee. Heator does technical investigative work including evidence collection and processing of stolen vehicles. The hotel had not been able to find the owner of a parked vehicle. A bicycle patrolman ran the tag number, and the vehicle was recorded on the NCIC (National Crime Information Computer) as being stolen and under other investigation by the FBI. The FBI came to the Crown Plaza in Nashville to get prints from the outside and inside of the vehicle. There were dried blood stains in the car. Heator identified the vehicle he found. Using luminal, a chemical agent, the police were able to see that blood had been wiped off the back seat of the car and the side of the front passenger seat. The vehicle was processed at Nashville headquarters on February 27, 1998.

¶21. A fingerprint analysis was performed by the Nashville police. There was a match of known fingerprints of Smith to latent prints found on the vehicle. The FBI performed a DNA analysis. The blood samples from the vehicle found in Nashville were compared to the jawbone of Theragood. The DNA from the jawbone and the blood samples from the console, the seatbelt and the carpeting were the same.

## STATEMENT OF ISSUES

**I. Whether the denial of an alibi instruction under the indictment constituted reversible prejudicial error.**

**II. Whether jury instruction number 10 constituted a substantial prejudicial jurisdictional variance from the indictment.**

**III. Whether the trial court failed to properly consider Smith's challenge to the venire based upon** *Batson*.

**IV. Whether the delay in bringing Smith to trial resulted in a denial of Smith's right to a fair trial.**

**V. Whether the denial of Smith's motion for (1) permission of the private investigator to travel and/or counsel to travel and (2) the denial of the appointment of an entomologist in light of the spoliation of evidence constitutes a denial of a fair trial in violation of state rights of due process procedurally and substantively.**

**VI. Whether the trial court erred in denying Smith's motion for a mistrial.**

**VII. Whether the admission of the photographs was highly inflammatory and prejudicial.**

**VIII. Whether the trial court erred in amending the indictment to charge Smith as a habitual offender.**

**IX. Whether the trial court erred in overruling Smith's Motion for J.N.O.V.**

**X. Whether the trial court erred in overruling Smith's Motion for a New Trial based upon**

**the weight of the evidence.**

## LEGAL ANALYSIS

## I. Alibi Instruction

¶22. Smith argues that the trial court committed reversible error by refusing his proffered alibi instruction:

Alibi means elsewhere or in another place. In this case, the defendant is asserting the defense of alibi by saying that at the time of death of the decedent the defendant was in the State of Florida.

Alibi is a legal and proper defense in law. The defendant is not required to establish the truth of his alibi to your satisfaction, but if the evidence or lack of evidence in this case raises in the minds of the jury a reasonable doubt as to whether the defendant was present and committed the crime, then you must give him the benefit of the doubt and acquit him.

¶23. The standard of appellate review applicable to questions of denial of jury instructions was recently reiterated:

When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed. ***Burton ex rel. Bradford v. Barnett***, 615 So.2d 580, 583 (Miss. 1993). Similarly, this Court has stated that "[i] n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman v. State*, 697 So.2d 777, 782 (Miss. 1997) (quoting *Collins v. State*, 691 So.2d 918 (Miss. 1997)). In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.

*Milano v. State*, 790 So.2d 179, 184 (Miss. 2001).

¶24. While the trial court determined that there was no evidentiary basis for giving the alibi instruction, the trial court did give Smith's jury instruction D-2A, which provided a two-theory circumstantial evidence instruction. Jury instruction D-2A was given by the trial court as jury instruction number 11. Jury instruction 11 stated as follows:

The court instructs the jury that if there are any facts or circumstances in this case susceptible of two interpretations, one favorable and the other unfavorable to the defendant, WILLIAM SMITH and if after you have considered such facts or circumstances with all the other evidence in this case, there is a reasonable doubt as to the exclusion of every reasonable hypothesis consistent with innocence, you must resolve such doubt in favor of the defendant, and place upon such facts or circumstances the interpretation favorable to the defendant.

¶25. Smith claimed that he was entitled to the alibi instruction based upon the inability of the forensic pathologists to pinpoint an exact time of death from examining the decomposing body. The record reflects the following exchange during the jury instruction conference:

State: Your Honor, he's not entitled to an alibi defense. It's been my burden of proof the whole time

that the crime was committed on or about January the 29th of 1998. There has been no proof before this jury as to the locations of the defendant between the hours of 1:30 in the morning and 11:20 in the morning when he checked into the Days Inn hotel. That's been my burden of proof. Their alibi is going to be that he was in Florida on February the 2nd. It's been my burden of proof, and it's in my elements that I had to prove beyond a reasonable doubt that on or about January the 29th of 1998, this crime was committed, and therefore, he's not entitled to an alibi defense because there's been no proof as to where he was on the 29th.

Defense: Your Honor, in response, if the court please[s], nobody can pinpoint the time of death. He said on or about. We had two different experts, and you know what we've gone through about that. And they have established him in Memphis at certain times, and we have established him Florida at certain times, and the time of death is up in the air, the factual issue. So we feel like the alibi is obviously an appropriate charge.

State: In the second place, there's been no proof that he's the man that checked into the hotel on February the 2nd. The witness never identified him, Your Honor. I mean, that's the whole problem. There's a lack of proof as far as the alibi is concerned because you don't have any proof before the court or the jury that this is in fact the man that checked into the hotel. All the clerk testified to was there was a man named A. C. Smith that checked into the hotel. She did not identify him as being the person.

Defense: Of course, in the record so far during the State's case, A. C. Smith has come up at, I think, the motel, the Hampton Inn, the Days Inn, the other ones. It was A. C. Smith from time to time, and that's something he can argue to the jury.

State: Again, Your Honor, there's no proof before the jury that's who it was, and that's the problem. There's no proof before the jury that the person who checked into the hotel on the 2nd was this man right here. And once again, the burden of proof falls on me to prove that the crime was committed on or about January the 29th, which is alleged in the indictment, and which is what I have to prove. And there has been no proof as to where he was from the Defense on January the 29th. He's not entitled to an alibi after the fact.

Defense: It's on or about, and they can't prove time of death, and we know he was incarcerated on the material witness thing right after that. So he could have been in jail. The [S]tate of Florida covers motel and jail.

Court: All right. I need to go back. I didn't say what number. Defense 2-A was given as No. 11, Jury Instruction No. 11.

(JURY INSTRUCTION NO. 11 WAS MARKED.)

Defense: Of course, he can make these factual arguments to the jury.

State: The problem is it's got -- it's not the law.

Defense: It's crucial to our case.

State: This is the law in the [S]tate of Mississippi, not the reasonable inferences, and the law is there

has to be an evidentiary basis for it, and there is none.

Defense: We think it is. He was at the motel or he was in jail. Okay? And nobody can pinpoint the time of death. If somebody actually saw this lady get shot right then, then sure, they don't do that, Judge.

Court: I have a problem with that, Mr. Champion. What do you say about the -- obviously, you have circumstantial evidence saying when he was last seen with the victim and when he was seen with the baby and not the victim, all right, that you're trying to use -- obviously trying to use to pinpoint the time, but you don't have anybody -- you don't have an actual witness as to the time of the killing, and you don't have any doctor saying -- that can pinpoint the time of death. That's my concern, too. What about it from that point of view?

State: You can write out my date on my jury instruction, and I don't have a problem with that. But as far as the jury instruction reads right now, I have to prove and I have -- my whole theory from day one was to prove what happened on January the 29th.

Court: I understand that.

State: You know, if you're not going to hold me to that burden of proof with the jury.

Court: Well, obviously, if I didn't do that, it's going to come back anyway. So I can't do that.

State: Well, I mean, they can't have it -- I have to prove that this happened on January -- if one of the jurors feels like it happened January 30th, then I have failed to prove one of the elements of my crime, and they have to find him not guilty.

Defense: It's on or about. That's what it is.

Court: I think that's the whole point of the defense of the defendant, isn't it?

State: I just don't think there's an evidentiary basis anyway. And my second argument is there's no proof before the jury that this is the man that checked into the hotel, and there's not, and the court knows that.

Defense: Your Honor, she said -- I think it was either Mr. Smith or an A. C. Smith, and that name was linked up through the State's case. You heard that all through the State's case.

State: But each person that's been -- each time A. C. Smith was used, he was positively identified by my witness as A. C. Smith. There's not an evidentiary basis for the jury right now that this was the man that checked into the hotel.

¶26. At the hearing on Smith's post trial motions, including a motion for J.N.O.V. or in the alternative a new trial, Smith again raised the refusal of the alibi instruction as error. The trial court provided its reasoning for denying the alibi instruction and determined that the motion for J.N.O.V. or, in the alternative, a new trial also failed on this assignment of error. Furthermore, in denying the motion, the trial court also found that any error, if it existed, was not reversible error but harmless error.

Court: First, I've got to say that this case -- it was all circumstantial, but the circumstantial evidence as

to Mr. Smith's guilt, I just have to say, was just overwhelming; ... And I don't know if there's any legal basis for it in the case law at all, but I have to say that if I did make a mistake on the alibi instruction -- which I don't think I did -- it would be harmless; and I don't know if there is any case law that supports that, but I'm just saying in this situation -- and I'm putting this one the situation -- and I'm putting this on the record to try to be honest about what my feelings and thinkings and beliefs under the law are about this. It is just so overwhelming, the evidence is, that I think it would be harmless, and any appellate court that might review it, if they could have seen and heard everything in the courtroom like I did, I think they couldn't come to the conclusion that if it was a mistake -- if it was wrong not to give the alibi instruction, that it was harmless. I don't think that it was appropriate to give the alibi instruction. I agree with Mr. Jones. I agree with the position that the State can't come in now and say that after they've said A. C. Smith all the way through the trial that this is not the same A. C. Smith because I agree with Mr. Jones' argument that are they just going to find a hotel in Florida that just happened to have an A. C. Smith check in? No, I don't think so. I think that was him. But the question to me was: Was an alibi established for the time of death? Yes, the forensic evidence indicated that it was a range, and they couldn't say specifically because the young lady had been out there for so long; but the evidence again, was overwhelming that the last time she was seen was on the early or late -- I don't know how everybody -- everybody has different terms -- so, you know, what I would call late night on the 29th when they left the house of his friend over there, as I recall. ... They left the Wallace's house, and then she was never seen again when they checked into the hotel the next morning or later that night. I can't remember the exact detailed time, but all of those people -- she was never seen again. He was there with the baby. He was obviously well-caring for the baby and concerned about the welfare of the baby and doing everything he can to take care of the baby. I mean, that's clear. But we also know from the testimony that the mother wouldn't have just disappeared like that based on what all the family said and her relationship. So I think the evidence is overwhelming the day in question was late night the 29th, early morning of the 30th.... Excuse me, the 28th and 29th. Late night of the 28th or early morning of the 29th when he checked into the hotel. The lady was never seen again. I think that pinpoints the day, and I think the circumstantial evidence was overwhelming as to that day. So I didn't give the instruction. On the other hand, it should be clear from the record that -- or clear in the record that even though we didn't grant the instruction, Ms. Abioto was told that she could argue -- Mr. Jones was told that -- that she could argue in the closing statement all that factual situation that they couldn't pinpoint it to the day and that he was down in Florida at that time, but there wasn't any evidence ever presented anywhere any time by anybody, even any inference, that she was seen anywhere any time after January 28th -- that night of January 28th. It's just not there. So I didn't think he was entitled to an alibi instruction, but again, if I'm wrong -- there may not be any case law to support it, but it was just completely harmless given the overwhelming circumstantial evidence here.

¶27. Smith is correct in stating that this Court has held that where a defendant interposes the defense of alibi and presents testimony in support of such a defense, the defense is entitled to a jury instruction focusing upon such a theory. *Young v. State*, 451 So.2d 208, 210 (Miss. 1984) (citing *Sanford v. State*, 372 So.2d 276 (Miss. 1979)). However, as the trial court in the case sub judice stated, that jury instruction must be supported by the evidence. *See Wilson v. State*, 592 So.2d 993, 997 (Miss. 1991).

¶28. The record clearly reflects the trial court's consideration of the alibi instruction in the context of the jury instructions taken as a whole and in light of the circumstantial evidence that was presented. In *Higgins v.*

*State*, 725 So.2d 220, 223 (Miss. 1998), this Court summarized Mississippi's law on jury instructions, in relevant part, as follows:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence.

¶29. Therefore, we find no merit in this assignment of error.

## II. Jury Instruction Amendment

¶30. Smith argues that the trial court erred in giving a jury instruction that set forth a date which differed from that set forth in the indictment. The date in question concerns the day that Theragood was killed. The indictment provides:

> That WILLIAM C. SMITH (a/k/a) Mustapha Amin), Late of the County and State aforesaid, on or about the 28th day of JANUARY, in the year of our Lord 1998, in the County and State aforesaid, and within the jurisdiction of this Court, did wilfully, unlawfully and feloniously, shoot with a firearm and kill Georgette Theragood, a human being; WILLIAM C. SMITH (a/k/a Mustapha Amin) acted with the deliberate design to effect the death of Georgette Theragood, in direct violation of Section 97-3-19 (1) (a), Mississippi Code 1972 Annotated, as amended, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Mississippi.

¶31. Jury instruction number 10 given to the jury states:

> The Defendant William Christopher Smith, is charged with the crime of Murder.

> If you find from the evidence in this case, beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence, that:

> 1. The deceased, Georgette Theragood, was a living person; and

> 2. On or about January 29, 1998, William Christopher Smith, did shoot with a firearm and kill Georgette Theragood with the deliberate design to effect the death of Georgette Theragood, then you shall find the defendant guilty of Murder.

> If the State has failed to prove any one or more of these elements beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence, then you shall find the defendant not guilty.

¶32. Smith argues that the date contained in jury instruction number 10 on or about January 29, 1998, as opposed to the date stated in the indictment, on or about January 28th, denied him the ability to present an alibi defense.

¶33. The record does not reflect that Smith ever objected to the date on or about January 29th, 1998, contained in jury instruction S-1 given as jury instruction number 10. In fact, the record specifically provides, regarding jury instruction number 10, as follows:

Court: Okay. S-1, form of the verdict -- not the form of the verdict, but the elements of the crime for the State. Mr. Jones?

Defense: If the Court please, Your Honor, we've looked at it. Our only objection is that I think it should add that circumstantial language since this is a circumstantial evidence case. The court knows what I'm talking about.

Court: Mr. Champion?

State: That is the circumstantial language. I added "to the exclusion of every reasonable hypothesis consistent with innocence."

Court: Right. That is the --

Defense: Okay. Did he have it in there? Okay.

Court: Yeah. "And to the exclusion of" -- it's beyond a -- "If you find from the evidence in this case, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence."

Defense: Okay

Court: All right. So no objection then? So that will be -- is that right?

Defense: Yes, sir.

Court: Okay. That will be No. 10 -- given as No. 10.

¶34. The present case is similar to *Jones v. State*, 776 So.2d 643, 653 (Miss. 2000). In *Jones*, the defense asserted that the trial court committed reversible error in granting the State's jury instruction. *Id*. However, Jones had failed to object to the jury instruction offered by the State at trial. *Id*. Not only did Jones fail to object, he agreed with the revised instruction. *Id*. This Court determined that Jones had waived any objection by not objecting to the jury instruction at trial. This Court stated:

> This Court has held on numerous occasions that an offended party's failure to object to jury instructions at trial procedurally bars the issue on appeal. *Walker v. State*, 729 So.2d 197, 202 (Miss. 1998); *See also* **Green v. State**, 631 So.2d 167, 173 (Miss. 1994) ("Green failed to object to the manslaughter instruction given at trial; therefore, it is not necessary for us to review this assignment.").

776 So.2d at 653.

¶35. Accordingly, Smith did not object to jury instruction number 10. We find that this issue is without merit as it is procedurally barred.

### III. *Batson* Challenge

¶36. Smith contends that the trial court failed to follow the proper procedure established under **Batson** by not requiring the State to articulate race neutral reasons for striking a black juror. The record reflects the following exchange during jury selection:

State: I'm going to use S-1 on 80, and I tender 84.

Ms. Abioto (Defense): Under the **Batson** rule, I --

Court: You have to make a showing of prejudice.

Mr. Abioto (Defense): He does.

Court: No, you do.

State: I think I've left four or five [black jurors] on there already.

Court: That's right. There's no reason to make a **Batson** challenge just because he struck one black since you've been striking the whites to get to the black.

Ms. Abioto (Defense): I don't think so.

Court: Well, that's fine, Ms. Abioto. You can do that as a strategy, but you can't come back and say the State is wrong for striking one black when you've been striking these caucasians just to try to get to that black.

Ms. Abioto (Defense): We've got quite a few caucasians on here, Judge.

Court: Yeah, but you're -- we're all sitting here in the same room. You and Mr. Jones are talking about striking trying to get to 80, which is fine, but you can't attack the State for striking a black that you've been striking caucasians just because they're caucasians to try to get to that black. You never stated a reason for any of them. He could do a reverse **Batson** on you -.

State : I'm fixing to do it in a minute.

Court: -- and be successful probably.

State: I'm fixing to do it in just a minute.

Ms. Abioto (Defense): Okay. Well, then you're going to have the same ruling I do then.

Okay. Let's just move on. What's the next one?

State: Eighty-four.

Ms. Abioto (Defense): Did you say 84?

State: Uh-huh.

Court: Yes

Ms. Abioto (Defense): Strike him.

Court: What did we say, D-10?

Mr. Jones (Defense): Yes, sir

State: Eighty-eight.

Mr. Abioto (Defense): Strike him.

Court: D-11.

State: S-2 is 89.

Court: Okay.

Mr. Jones (Defense): Your Honor, just -- well, he struck two blacks in a row, the last two that came up. She requested I make that motion under *Batson*. If the court -- whatever the court feels.

Court: Well, you've got to make a showing first, Mr. Jones.

Mr. Jones (Defense): He struck the last two blacks in a row.

Court: There's I think, three or four -- are three already on the jury?

State: Four.

Court: There's four already on the jury. I don't think there's been a prima facie showing of striking blacks.

¶37. A reversal will only occur if the factual findings of the trial judge appear to be "clearly erroneous or against the overwhelming weight of the evidence." *Tanner*, 764 So.2d 385, 393 (Miss. 2000) (citing *Stewart v. State*, 662 So.2d 552, 558 (Miss. 1995)); *Davis v. State*, 551 So.2d 165, 171 (Miss. 1989). "On appellate review, the trial court's determinations under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), are accorded great deference because they are based, in a large part, on credibility."*Coleman v. State*, 697 So.2d 777, 785 (Miss. 1997)(citing *Lockett v. State*, 517 So.2d 1346, 1349 (Miss.1987)). The term "great deference" has been defined in the *Batson* context as meaning an insulation from appellate reversal any trial findings which are not clearly erroneous. *Lockett v. State*, 517 So.2d at 1349 (Miss.1987).

¶38. In *Batson*, the United States Supreme Court held that a peremptory challenge cannot be used to exclude venire-persons from jury service based on their race. *Batson v. Kentucky*, 476 U.S. 89, 106 S.Ct.1712, 90 L.Ed.2d 69 (1986). A peremptory challenge based on race constitutes a violation of equal protection. *Id*. at 98.

¶39. The necessary steps to resolve a peremptory challenge based upon *Batson* are cited in *Stewart v. State*, 662 So.2d 552, 557-58 (Miss. 1995), as follows:

1. The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge.

2. If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror.

3. The trial court must then determine whether the objecting party has met their burden to prove there

has been purposeful discrimination in the exercise of peremptory challenges.

To establish the first prong, a prima facie case under *Batson*, the objecting party must show (1) that he/she is a member of a "cognizable racial group," (2) the prosecutor has exercised peremptory challenges toward the elimination of prospective jurors of his race, and (3) the facts and circumstances raised and inference the prosecutor used his peremptory challenges for the purpose of striking minorities. *Conerly v. State*, 544 So.2d 1370, 1376-77 (Miss. 1989).

¶40. In the case sub judice, the trial court made the determination that no prima facie case was established. Further more, the trial court noted for the record that the State had allowed four black jurors to be empaneled without objection before the first peremptory strike. The trial court concluded that the defense's strategy had been to strike white jurors in order to get to the black juror struck by the State. The defense did not deny the trial court's observation that the defense's strategy was to strike white jurors.

¶41. A review of the record demonstrates that the trial court did not err in its ruling. Great deference is afforded to a trial court's ruling. Therefore, we find that the issue is without merit.

## IV. Speedy Trial and Loss of Evidence

¶42. Smith argues that he was denied his right to due process by a lack of a speedy trial and the spoliation of evidence. In regard to the speedy trial issue, Smith was indicted on September 10, 1998, for the murder of Theragood. A motion for speedy trial was filed on July 5, 2000.

¶43. Smith claims that he noticed the court of his right to speedy trial in 1998. The record does not confirm this kind of claim. The record only contains a motion for speedy trial dated July 5, 2000. During an August 11, 2000, hearing the State argued that Smith was being held in Florida on federal charges. The prosecutor argued that the State had to attempt to get Smith to Mississippi through a writ which was denied, however, the State did everything that it was required to do. There was no finding of facts or conclusion of law in the record concerning this issue. At the hearing, however, the trial court allowed a continuance from a proposed October trial date to the next spring term. The trial court informed Smith that the time would not run against the State and that there would be no speedy trial issue. Smith and his counsel agreed and agreed to waive the time until the new setting of the case. In addition, the trial court's pretrial order does not contain any reference to the speedy trial issue. Smith did not raise the speedy trial issue in either the motion for new trial or jnov.

¶44. In the post-trial motions and on appeal, Smith asserted that he was denied due process due to the loss of evidence that he maintained was exculpatory in nature. In specific, Smith claims that the baby bag, which was sent home with George, would show a lack of his fingerprints; loss of crime scene photographs depicting the position of the body by DeSoto County law enforcement; FBI evidence collected the next day at the scene; and the loss of the victim's clothing. He requested a new trial which the trial court denied on the record.

¶45. In *Northup v. State*, 793 So.2d 618, 623 (Miss. 2001), this Court addressed the issue of spoliation of evidence as follows:

> The State has the duty to preserve evidence, but that duty is limited to that evidence which "might be expected to play a significant role in the suspect's defense." *Tolbert v. State*, 511 So.2d 1368, 1372 (Miss.1987) (quoting *California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 2534, 81

L.Ed.2d 413, 422 (1984)).

When the defendant claims he is entitled to a new trial based on the prosecution's having lost or destroyed evidence, this Court employs a two-part test. First, it must be determined whether the evidence would have played a significant role in the defendant's case. To play a significant role, the exculpatory nature and value of the evidence must have been apparent before the evidence was lost. The second part of the test requires that the defendant have no way of obtaining comparable evidence by other means. *Tolbert*, 511 So.2d at 1372 (citations omitted).

The Court also set out the general rule as follows:

It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoliator. Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent. *Tolbert*, 511 So.2d at 1372-73 (citing *Washington v. State*, 478 So.2d 1028, 1032-33 (Miss.1985)).

*Northup v. State*, 793 So.2d at 623-24. The trial court made an on-the-record ruling concerning the spoliation of evidence. The trial judge stated in part the following:

I have to say for the record there is no proof at all that there was any lost evidence intentionally. Obviously, there was some inept police work in this case, and that was all presented to the jury; but that goes to the weight and credibility and sufficiency for which the jury is impaneled to determine all of that. And they knew all that. That was very professionally attacked by you, Ms. Abiato, and very clearly shown to the jury, the ineptness and how that was handled, and the jury concluded from all the other evidence - - and again, it was overwhelming in my view that that didn't matter. So certainly I can't set aside the verdict on that.

The jury heard about the loss of the evidence and could weigh the evidence as presented. We find that the trial court ruling should be affirmed and this issue is without merit. Smith may have filed a speedy trial motion, however, the trial court made no specific speedy trial ruling. Further, Smith and his counsel agreed on the record to waive any speedy trial issues up to the time of trial in 2001. As to the spoliation of evidence, the trial court made an on- the-record ruling that the spoliation of evidence was not intentional.

## V. Expert Assistance

¶46. Smith asserts the denial of his motion for a private investigator and counsel to travel and the appointment of an entomologist, especially in light of the spoliation of evidence, equates to a denial of a fair trial and due process.

¶47. "The trial court's decision on a motion for funding for consultants or investigators for an indigent defendant is reviewed for abuse of discretion." *Grayson v. State*, 806 So.2d 241, 254 (Miss. 2001)(citing *Hansen v. State*, 592 So.2d 114, 125 (Miss.1991).

¶48. During a November 2, 2000, hearing, the trial court allowed a court-appointed private investigator. The trial court required the investigator and defense counsel to convince the judge of the necessity to travel to locations out of the immediate area. The trial court also denied Smith's motion for assigned counsel to

travel to take depositions. The trial judge stated that defense counsel could question the State's witnesses after hours and that defense could speak to any other witnesses by telephone.

¶49. In a prior August 11, 2000, hearing the trial court allowed Smith to have a pathologist to review the autopsy information and be an expert witness. As for the motion for funding of a court-appointed forensic entomologist, Smith requested that the motion be held in abeyance until such time as the court-appointed pathologist submitted his report. At a later hearing, defense counsel stated that without the lost photographs, the entomologist would not be able to make a determination. The trial judge denied the motion for the entomologist and ruled that the information could be found through cross-examination of experts presented by the State.

¶50. Smith was granted funding for a pathologist. In addition, he was granted funding for an investigator. The trial court placed a restriction on travel for the investigator and to have an accounting of the expenses. The trial court also found no need for defense counsel to travel when she could interview witnesses after hours and call other potential witnesses on the telephone. The defense indicated that the entomologist could not make a determination without photographs from the crime scene and the judge further stated that the State's experts could be cross-examined by defense counsel. This Court finds that Smith was given sufficient due process and granted expert assistance for his case. He had a pathologist and an investigator, and defense counsel indicated that an entomologist could not make any determinations. Travel was limited somewhat by the trial judge, however, the defense had other reasonable options to use telephones, faxes and interview other potential witnesses. Smith had assistance in his case. Based on the circumstances of this case, we cannot say that the trial court abused its discretion in ruling on motions for funding for consultants or investigators for Smith. This issue is without merit.

## VI. Mistrial

¶51. Smith argues that the trial court erred in denying his motion for mistrial. On January 26, 2001, Smith filed a motion in limine to exclude all references to Smith's criminal background.[1] At trial, during the State's direct examination of FBI agent Terry Nelson, Nelson made a reference that Amin told him that he had been incarcerated. The State did not inquire into any prior incarceration. The defense objected to Nelson's testimony and made a motion for mistrial. The trial court overruled the defense's objection and denied the motion for mistrial. However, the trial court admonished the jury as to the reference relating to the incarceration. The record reflects the following exchange:

State: During the course of this interview, what was his demeanor concerning how he got there and the position that he was in?

Nelson: He was very professional. I have to give him a great deal of credit. He wasn't nervous. I have interviewed thousands of people over my 30-year career. He was very professional in his statements. He looked you straight in the eye, which is unusual. A lot of times people who are not telling the truth, their lower abdomen will -- well, you can sense kind of a convulsant situation. He did not do that. He was very calm, very cool, and I have to give him a lot of credit. Although I didn't believe him, he was very professional.

State: Did he express to you about the predicament he was in and how he had gotten there and why he may have been in this predicament?

Nelson: Well, he said he had been incarcerated.

Defense: Could we approach for a second, Your Honor.

(COUNSEL APPROACHED THE BENCH FOR A CONFERENCE;

SAME NOT REPORTED.)

(THE FOLLOWING PROCEEDINGS TOOK PLACE IN OPEN COURT

OUTSIDE THE PRESENCE OF THE JURY. THE DEFENDANT

WAS PRESENT WITH HIS ATTORNEYS.)

Court: Go ahead.

Defense: Your Honor, ... comes now the defendant through counsel and moves this court to declare a mistrial in this case on the basis that FBI Agent Terry Nelson has stated before the jury that this man -- for information received form this man was in fact incarcerated which might have had some impact on why he was acting or saying what he was. We have had extensive motions in limine concerning prior criminal references of any type, and this court has gone -- certainly done a good job on trying to keep this record as clean as possible. I think you've advised us on numerous times not to open doors. You've advised prosecutors to dedact and deduct and subtract and delete things that were prejudicial, and now we have before the jury that this man was incarcerated, you know; and we feel that that should not have happened, and we feel it's now in this jury's mind. It's prejudicial and violates the spirit of the ruling of the motion in limine made earlier. For that reason, we move for a mistrial.

State: Your Honor, this is a statement this defendant gave out of his own mouth to the police, okay, or to the FBI and, you know, how limited have I got to be? I mean, we can't redact everything out of the statement. I want to read this in context. I want to read this into the record what is reflected in Agent Nelson's report. "Amin" -- okay. Now we're dealing with William Christopher Smith. We're not dealing with Mustapha Amin. Okay. "Amin advised that he became involved" --

Court: Wait a minute. Make sure there's no confusion for the record. William Christopher Smith represented himself to be --

State: Exactly.

Court: -- Amin to these FBI agents.

State: Okay. So we've got a false -- we've got a series of falsities going on here.

Court: Right, I understand. Okay.

State: This is the part of the statement, "Amin advised that he became involved with the Muslims while in jail for possession and manufacture of false documents. In jail, he met an older Muslim with a following of 500 members. Amin taught him how to be more efficient and currently the membership is up to 1500 members. He again refused to provide any information about the group or its leaders. He reiterated that if the organization did not turn Abdul over to the authorities he would provide

information on the subject and organization." And this is more organizational information here. You know, how he became involved with the organization. I mean, this Mustapha Amin's mind here going on to these officers here, and they're reflecting what he said. I'm not saying that William Christopher Smith was incarcerated. I'm reflecting to the jury what Mustapha Amin told the agents while they were there that day. There is no proof before this jury that William Christopher Smith was the one who was being referred to as being incarcerated. Do you understand what I'm saying?

Court: I understand what you're saying.

State: I mean, he's already testified he didn't believe what he was saying.

Court: I understand. Anything else, Mr. Jones?

Defense: Other than, Your Honor, I think it's something that can't be removed from the jurors minds. A lot of times, I think, in the past -- I don't know. You might have had some of these cases. They'll introduce a statement of a defendant, and if the defendant refers to like a prior bankruptcy he committed or something like that, y'all dedact that or --

Court: Bank robbery.

Defense: Whatever. And you do. You take care to avoid those problems. I know that, but I think the State -- they're putting -- they keep going over this stuff over -- they've already introduced what they want, and, you know, they're just trying to pound and pound and pound and pound. They've got a four-hour oral interview. So I guess we could sit up here with Mr. Nelson for four hours and he could recite the whole thing, and I think the State has some responsibility of getting to their points and not trying to do so with prejudicial material.

State: I also carry the burden of proof.

Defense: Yeah, but at some point in time -- go ahead. Also, William Smith has been identified as Mustapha Amin throughout the whole trial.

State: Not one of these people right here has identified this man as William Christopher Smith.

Court: No, I understand. I know that. I'm going to deny the motion. I don't think there's any basis at all for it because of just the arguments Mr. Champion has made. This is what he's telling about why he was in the situation and why he was where he was and why he did what he did and why he came to pick up the gun. None of the FBI agents have identified him as William Christopher Smith. Obviously, the jury knows he's William Christopher Smith. I actually think it will do harm to your case, Mr. Jones, to have done it, but I don't know anything else to do now but to admonish the jury

Defense: Well, if you --

Court: Because you've interrupted the story now. I mean, if he had been able to go on with the story, he would have said that -- based on the statement Mr. Champion just read, I assume he's going to continue with that and say he was incarcerated and that's where he got to be a Muslim and that's how he got in with his sect, and he's acting on the orders of this sect.

State: That's exactly where I'm going.

Defense: Look, if you sustain our objection, we will move for a mistrial, and at that point, you admonish, and we'll renew the motion for mistrial. If you overrule the objection, I guess we go forward. I think that's procedurally how its done, but we stand on our objection.

Court: Okay. Well, I'm going to deny the objection. I'm going to have to bring the jury back out and admonish them, I guess.

State: I mean, do you not want me getting into it anymore?

Court: Where are you going with it about --

State: What I just read. Well, I tell you what -- you know, I won't ask anymore questions about that -- I'll go to another part of it -- as far as, you know, the one sentence, and I can show with the court and defense counsel permission, I'll show Agent Nelson, as far as his report is concerned, where I'm going to go with it if you're going to admonish the jury because he mentioned incarceration.

Defense: First, I want to know if the objection is sustained. It's either sustained or overruled, and then we go from there.

Court: What objection?

Defense: The objection to his comment, and then if you sustain it, we move for a mistrial.

Court: No, I'm going to overrule the objection. I don't think there's any basis for the objection because I think the man is entitled to make an explanation about the statements made by Mr. Amin, being Mr. Smith, as an explanation of the story he was giving to the law enforcement officers. But because you raised the issue, and again, because I'm going to be extremely cautious in this trial, I'm going to admonish the jury. I'm overruling your objection because I think it has no basis at all, but I'm still going to admonish the jury because you made the objection just in case I'm wrong about that point because the admonishment of the jury will cure any bias as long as I get a non-biased response from the jury. I'm going to ask them will this affect any of you.

Court: Bring the jury back.

Court: All right. Ladies and gentlemen, just before we went out we had a reference by this FBI agent here about a statement that the person he was interviewing known to him as Mustapha Amin was beginning to go into some story about a relation of facts or whatever about why he was there and started the story with a reference to an incarceration. All right? Now, that has nothing to do with this case. It [totally] will be disregarded by you. Does everybody understand that? It has no effect on this. I don't know what it's for. It might have been for a traffic ticked because we didn't hear the rest of the story because the story was stopped by an objection made by the Defense. All right? Okay. So we'll -- does everybody understand that? It has to be totally disregarded. It has nothing to do with this case. I don't know what it's about, but it has nothing to do with this case. Is everybody clear about that? Does everybody understand that? Does everybody understand it has to be completely disregarded in any consideration of the facts of this case? Does everybody understand that on the jury panel? I've got to see heads. All right. Is anybody going to have a problem with that? Is there anybody that cannot disregard it. All right. I'm getting a positive response from everybody that it will

not affect them and they have set it aside, and we will go forward from this point.

Defense: We renew the motion for mistrial.

Court: All right. It will be denied.

¶52. It is a well-settled rule in this State that a mistrial is reserved for those instances wh ere the trial court cannot take any action which would correct improper occurrences inside or outside the courtroom. *Walker v. State*, 671 So.2d 581, 621 (Miss. 1995). "[T]rial judges are peculiarly situation so as to decide (better and more logically than anyone else) when a trial should be discontinued." *Davis v. State*, 530 So.2d 694, 697 (Miss. 1988)(citing *Schwarzauer v. State*, 339 So.2d 980, 982 (Miss. 1976)).

¶53. The trial court determined that, in an effort to be overly cautious, it would admonish the jury as to the incarceration. This Court finds that this issue is without merit. If any error exists assuming arguendo, it is harmless error. The trial court properly admonished the jury, and the jury positively responded that it could set aside the reference to incarceration and not let it affect their deliberation.

## VII. Photographs

¶54. In his motion in limine, Smith sought to exclude the introduction of photographs.[2] The trial court overruled the objection on the grounds that the photographs were probative of the date of death. However, the trial court acknowledged Smith's continuing objection to Dr. Hayne's testimony.

¶55. During the hearing on Smith's motion in limine, the trial court examined the photographs and stated:

The court has reviewed the photographs, and they are -- I'd say for the vast majority of people it would be unpleasant for them to look at. However, the date of death, from the discovery I've seen and from the discussions with defense counsel, it's clear to me that the date of death is going to be one of the main issues of the defense in this case, and they in fact do have their own expert to attach the determination by the State's expert as to the approximate death based on decomposition.

Consequently, these pictures go to a central issue, if no the central issue, one of the central issues in this case that will determine the guilt or innocence of the defendant. The State carries the burden of proof beyond a reasonable doubt. They are required to prove each and every element, one of those being the approximate date of death as it relates to the other dates that they have presented into evidence with other witnesses before the jury.

And this is a circumstantial evidence case which makes it even tougher on the State, and since this is obviously, as stated by the defense, going to be attacked as to the determination of the date of death by Dr. Hayne and they're basing a large part of the defense on that, it is the central issue. And to therefore not allow the State to use the photographs would put them in a precarious situation and make it almost impossible to meet their burden of proof required.

The photographs do come down to the discretion of the judge. I am -- as everybody knows experienced in my court, I'm restrictive on the use of what anybody can consider gruesome photographs, but I think it's necessary in this particular circumstance to allow the State to use the photographs since this is the central issue and will be directly attacked by the defense. So I'm going to allow the photographs.

¶56. The admissibility of pictures of gruesome crime scenes is within the sound discretion of the trial court. *Chatman v. State*, 761 So.2d 851, 854 (Miss. 2001). Reversal of the trial court will occur only where there is a clear abuse of discretion. *Id*.; *Davis v. State*, 551 So.2d 165, 173 (Miss. 1989). "The discretion of the trial judge 'runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.'" *Spann v. State*, 771 So.2d 883, 895 (Miss. 2000) (quoting *Williams v. State*, 544 So.2d 783, 785 (Miss. 1987)). Photographs are considered to have evidentiary value in the following instances:

> (1) 'aid in describing the circumstances of the killing;
>
> (2) describing the location of the body and cause of death;
>
> (3) supplement of clarify witness testimony.'

*Spann v. State*, 771 So.2d at 895 (quoting *Westbrook v. State*, 658 So.2d 847, 849 (Miss. 1995).

¶57. This Court has held that:

> [T]he lower court's judgment will not be reviewed on the ground that photographs are gruesome and prejudicial, unless the lower court has abused its discretion.

*Griffin v. State*, 557 So.2d 542, 549-50 (Miss. 1990).

¶58. The State cites to *Underwood v. State*, 708 So.2d 18 (Miss. 1998), in support of the trial court's introduction of the photographs. In *Underwood*, this Court determined that the photographs were evidence used to establish the time of death, and therefore, they were both probative and admissible. *Id*. at 34.

¶59. Clearly, in the case sub judice, the photographs were probative of the condition of the body based on the decomposition and the determination of the date of death. We find that the issue is without merit. This trial court did not abuse its discretion in admitting the photographs.

## VIII. Habitual Offender Status

¶60. This trial court amended the indictment to reflect that Smith was a habitual offender pursuant to Miss. Code Ann. § 99-19-81 based upon documents presented by the State. The order reflecting the amendment was executed on February 2, 2001. Smith objected to the amendment at the hearing and at the motion for J.N.O.V., asserting the convictions were not certified.

¶61. Miss. Code Ann. § 99-19-81 (2000) provides for sentencing habitual criminals to a maximum term as follows:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

¶62. Rule 7.09 of the Uniform Rules of Circuit and County Court Practice allows for the amendment of an

indictment in order to charge an offender as habitual offender. Rule 7.09 reads:

> All indictments may be amended as to form but not as to the substance of the offense charged. Indictments may also be amended to charge the defendant as an habitual offender or to elevate the level of the offense where the offense is one which is subject to enhanced punishment for subsequent offenses and the amendment is to assert prior offenses justifying such enhancement (e.g., driving under the influence, Miss. Code Ann. § 63-11-30). Amendment shall be allowed only if the defendant is afforded a fair opportunity to present a defense and is not unfairly surprised.

URCCC 7.09.

¶63. Therefore, an indictment maybe amended to include the charge of habitual offender only if the offender is given "a fair opportunity to present a defense and is not unfairly surprised." *Adams v. State*, 772 So.2d 1010, 1020 (Miss. 2000); URCCC 7.09.

¶64. In the case sub judice, during a pretrial motion hearing held on August 11, 2000, the State informed the trial court and Smith that the State intended to seek to amend the indictment to charge Smith as a habitual offender. The State at that time still had not received the proper attachments in order to file the motion to amend. Upon receiving proof of the other felony convictions from the other jurisdictions the State, on September 13, 2000, filed its motion to amend the indictment. The trial court stated that Smith had been provided proper notice of the State's intention to amend the indictment to charge him as a habitual offender.

¶65. Smith further argues that the State did not establish that Smith was a habitual offender as outlined in Miss. Code Ann. § 99-19-81. Smith contends that the Florida convictions referenced a John Doe, and therefore, the Florida convictions were not sufficient to establish Smith's identity.

¶66. The Florida convictions were stamped certified as true and correct copies of the original documents. In the United States District Court, Smith was true billed on eleven counts. The true bill was styled as case number 94-84-CR-ORL-22, *United States of America v. John Doe a/k/a Lester J. Warren a/k/a William Christopher Smith a/k/a Alvin William Clifford Smith a/k/a Don Rasheed Kato*. Smith pled guilty and was convicted on three of the eleven counts. The other eight counts were dismissed under the plea. Smith was committed to the custody of the United States Bureau of Prisons for a term of twenty-four months.

¶67. M.R.E. 902(4) provides:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

> (4) Certified Copies of Public Records. A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form certified as correct by the custodian or other person authorized to make the certification....

¶68. In the case sub judice, the State was supplied certified copies of the true bill and the sentencing order regarding Smith's convictions in Florida. Furthermore, Smith was provided adequate notice that the State would seek habitual offender status and also provided the documents to investigate that the State sought to offer as self-authenticating. We find that the evidence presented by the State satisfied the requirements of

Miss. Code Ann. § 99-19-81. *See* **Moore v. State**, 631 So.2d 805 (Miss. 1994); *Ficklin v. State*, 758 So.2d 457, 462 (Miss. Ct. App. 2000), *Robinson v. State*, 784 So.2d 966, 972 (Miss. Ct. App. 2000). This issue is without merit.

## IX. and X. Legal Sufficiency and Weight of the Evidence

¶69. Smith asserts that the evidence was legally insufficient and that the jury verdict convicting him of murder, was contrary to the weight of the evidence.

¶70. On the issue of legal sufficiency, this Court held in **Pinkney v. State**, 538 So.2d 329, 353 (Miss. 1988), that reversal can only occur when evidence of one or more of the elements of the charged offense is such that 'reasonable and fair minded jurors could only find the accused not guilty." (citations omitted). The standard of review for a denial of a directed verdict, peremptory instruction and a JNOV are identical. **Coleman v. State**, 697 So.2d 777, 787 (Miss. 1997). A motion for JNOV, a motion for directed verdict and a request for peremptory instruction challenge the legal sufficiency of the evidence. **McClain v. State**, 625 So.2d 774, 778 (Miss. 1993). "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court. This occurred when the Circuit Court overruled [the] motion for JNOV." **McClain**, 625 So.2d at 778 (citing **Wetz v. State**, 503 So.2d 803, 807-08 (Miss. 1987)).

¶71. It is well established that matters regarding the weight of the evidence are to be resolved by the jury. **Neal v. State**, 451 So.2d 743, 758 (Miss. 1984); *Danner v. State*, 748 So.2d 844, 846 (Miss. Ct. App. 1999). "The court is bound by the jury findings upon an issue presented by the instruction requested by the [defendant]." **Kinney v. State**, 336 So.2d 493, 496 (Miss. 1976). A motion for new trial challenges the weight of the evidence. *Sheffield v. State*, 749 So.2d 123, 127 (Miss. 1999). A reversal is warranted only if the trial court abused its discretion in denying a motion for new trial. *Id*. (citing *Gleeton v. State*, 716 So.2d 1083 (Miss. 1998)). This Court held in **McFee v. State**, 511 So.2d 130, 133 (Miss. 1987) that it has limited authority to interfere with a jury verdict. The court looks at all the evidence in the light that is most consistent to the jury verdict. *Id*. The prosecution is given "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Id*.

> [I]f there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgement might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. *Id*. at 133-34.

*See also* **May v. State**, 460 So.2d 778, 781 (Miss.1984). This Court has held that a new trial will not be given unless the verdict is so contrary to the overwhelming weight of the evidence that an unconscionable injustice would occur by allowing the verdict to stand. **Groseclose v. State**, 440 So.2d 297, 300 (Miss. 1983). *See also* **Danner v. State**, 748 So.2d at 846. However, if a jury verdict convicting a defendant is against the overwhelming weight of the evidence, then the remedy is to grant a new trial. **Collier v. State**, 711 So.2d 458, 461 (Miss. 1998).

¶72. As to the credibility of witnesses, this Court in **Gathright v. State**, 380 So.2d 1276 (Miss. 1980), has held that "in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the state or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court." *Id*. at 1277 (citing

*Davis v. State,* 320 So.2d 789 (Miss.1975)).

¶73. In the case sub judice, the evidence met the legal sufficiency test and the weight of the evidence test for a denial of the JNOV and new trial motions. The main evidence showed that the victim, Theragood, was found dead on March 28, 1998, on Christopher Lane in DeSoto County from gunshot wounds to the head. Many of Smith's relatives lived along this street.

¶74. Witnesses testified that they saw Smith, Theragood and her child, Shayna, in the late evening and early morning of January 28-29, 1998. The Memphis hotel staff testified that only Smith and Shayna checked into the hotel on the morning of January 29. Smith stayed at the hotel with the child until February 1, 1998. According to the hotel staff, Smith stated that the baby's mother was an entertainer and was on tour for two months. The hotel staff from another nearby Memphis hotel testified that on January 30, 1998, Smith made reservations for his employees and left some luggage. The luggage was later determined to belong to Theragood.

¶75. Marcie Ford stated that on January 30 or 31, 1998, Shayna with left with her to babysit. Smith told Ford that Shayna's mother was in jail, and he also gave Ford a baby bag. The baby was subsequently left with Ford who contacted the police. When police gave Shayna to the Memphis juvenile court, a worker found .38 special bullets in the baby bag.

¶76. On February 6, Smith went to a Florida airport to retrieve a piece of luggage that set off an alarm on an airport metal detector. Smith identified himself as Mustapha Amin and claimed the luggage belonged to a member of his religious group. The bag contained a .38 caliber revolver that was wrapped in a towel inside a potato chip bag. Some of the fingerprints on the potato chip bag Smith as well as other items in the luggage belonged to Smith. While there was no positive identification, an FBI agent determined that the bullet fragments could have been fired from the gun found in the airport.

¶77. On February 26, 1998, the Nashville police responded to a call concerning a vehicle. A car identified to be like that in the photograph in Exhibit 3 was in a Nashville hotel parking garage. The police found blood and fingerprints in the car. The DNA comparison of blood in the vehicle to Theragood's jawbone was a match. Thus the evidence presented to the jury was legally sufficient, and the verdict was not against the overwhelming weight of the evidence. Accordingly, the trial court correctly denied both the jnov and new trial motions. This issue is without merit.

## CONCLUSION

¶78. For these reasons, the trial court's judgment is affirmed.

¶79. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PROBATION OR PAROLE AS A HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

    **PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ AND CARLSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY.**

1. The record does not reflect that Smith's motion in limine was actually granted. However, neither the State nor the trial court denied the defense's statement on the record that the motion in limine had been granted.

2. The photographs are State's exhibits 88-89.